[No. 3333.   Oct. 1, 1929.]

STATE v. DILLON.

[281 Pac. 474.]

O. O. Askren, of Roswell, for appellant.

R. C. Dow, Atty. Gen., and F. H. Patton, Asst. Atty. Gen., for the State.

### OPINION OF THE COURT

WATSON, J.   Appellant was convicted of the possession of intoxicating liquor for sale.   The only error here urged is in the overruling of his motion to return to him and to suppress as evidence certain liquors which the sheriff had seized under a search warrant which the trial court found, and the Attorney General apparently concedes, to have been illegal.

The overruling of the motion was based upon the trial court's understanding that this court, in State v. Hammond, No. 3010, had laid down the rule "that evidence, however obtained, whether legally or illegally, is admissible."   The opinion referred to has not been published; the cause having become moot by reason of the death of the appellant during the pendency of a motion for rehearing.   Since it is the sole basis of the decision, and the single point of difference here, we cannot do better than insert it in this opinion.   It follows:

"Botts, J. The question before us is whether or not papers are rendered inadmissible in evidence against a party by reason of their having been seized in an unreasonable search of his premises. The case in which the question arises is civil, the order of the court directing the search and seizure having been made in proceedings supplemental to execution. In the making of this search and seizure there can be no question but that appellant's rights guaranteed to him by section 10 of article 2 of the New Mexico Constitution were violated. Robinson et al. v. Richardson, 13 Gray (Mass.) 454. In fact there is no serious contention to the contrary. That section reads as follows:

" 'The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.'

"On this question the courts of the several jurisdictions fail to harmonize. No attempt will be made herein to discuss or cite the very numerous cases dealing with the subject, but reference is made to the notes appearing in 24 A. L. R. at page 1408, and 32 A. L. R. at page 408, with the several cases to which the notse are appended, for a collection of the various authorities. For some cases decided since the date of the last note, see Voorhies v. U. S. et al. (C. C. A.) 299 F. 275; State v. Warfield, 184 Wis. 56, 198 N. W. 854; State v. Dinger, 51 N. D. 98, 199 N. W. 196; Simmons v. Commonwealth, 203 Ky. 621, 262 S. W. 972; Thomas v. State, 27 Okl. Cr. 264, 226 P. 600; Foster v. State, 270 Okl. Cr. 270, 226 P. 602; Temperani v. U. S. (C. C. A.) 299 F. 365; State ex rel. Stange v. District Court et al., 71 Mont. 125, 227 P. 576; Bush v. State, 112 Neb. 384, 199 N. W. 792; State v. Reynolds, 101 Conn. 224, 125 A. 636; State v. Griffin, 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227; State v. Brown, 129 S. C. 286, 124 S. E. 87.

"The Supreme Court of the United States has adopted a rule of construction excluding from consideration in a criminal case evidence which has been obtained by a search and seizure in violation of the Fourth Amendment to the Federal Constitution, that amendment being in substance

the same as the section of the New Mexico Constitution above quoted. This rule has been followed by a number of the state courts. On the other hand, many of the state courts of last resort have refused to accept that doctrine, and permit evidence to be admitted against a defendant without regard to the means by which it has been obtained. Many of the courts even fail to agree with themselves, as is evidenced by the large number of dissenting opinions. We have not taken a poll of the several jurisdictions in an effort to ascertain on which side stand the greater number. Suffice it to say that an opinion deciding the point either way might be written in an hour's time, with ample and respectable authority to sustain it; but we have rather endeavored to discover the fundamental underlying principle by which a correct conclusion must be governed.

"The development of the federal rule is indicated by an examination of the following cases: Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; Adams v. New York, 192 U. S. 585, 24 S. Ct. 372, 375, 48 L. Ed. 575; Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341, 344, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Silverthorne Lumber Co. v. U. S., 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319; Flagg v. U. S. (C. C. A.) 233 F. 481, the principle of which is specially adopted by reference in the opinion of the Supreme Court in the Silverthorne Case, and Gouled v. U. S., 255 U. S. 299, 41 S. Ct. 261, 65 L. Ed. 647. That rule seems to be based on a combined consideration, or an amalgamation of the two guarantees against unreasonable search and self-incrimination, in that the conclusion is, in effect, that the admission of evidence obtained on a search violating the Fourth Amendment is a compelling of the defendant to incriminate himself in violation of the provisions of the Fifth Amendment. The rule has been severely criticized, Wigmore on Evidence (2d Ed.) § 2184, notwithstanding which it still has its champions.

"In so far as appellant's rights under our constitutional guaranty against self-incrimination are concerned, all question with reference thereto would seem to be settled by the case of State v. Barela, 23 N. M. 394, 168 P. 545, 547, L. R. A. 1918B, 844, which also contains language

strongly indicative of a disapproval of the federal rule now under consideration. The court speaking through Mr. Justice Parker, now Chief Justice, said:

" 'The general rule, as gathered from the foregoing authorities, may be stated to be that the admissibility of evidence is in no way determined or affected by the manner in which, or the means by which, it is obtained. If it is otherwise competent and relevant to the issues in the case, it is admissible, and does not violate either the constitutional guaranty against unlawful searches and seizures, or against involuntary self-incrimination. The provisions against unreasonable searches and seizures, and against compulsory self-incrimination, are limitations upon their general rule, and have much narrower scope and effect than is sometimes given them. The provision against unreasonable searches and seizures refers to searches and seizures by the government through legislative or judicial sanction, and not to the private acts of individuals. The provisions against self-incrimination are limited to testimonial compulsion under process of some kind directed against the defendant as a witness. It does not and cannot logically apply to actions of the defendant under compulsion of persons or officers without judicial sanction. In such cases the physical facts speak, not the defendant as a witness.'

"Here there is no question or threat of testimonial compulsion under process of some kind directed against the defendant as a witness; but it is argued that what is said in the Barela Case with reference to searches and seizures has no present application, because here the search was made under judicial sanction. Assuming that to be true, we shall examine the question anew.

"The theory, upon which many of the cases holding evidence obtained by an unlawful search is not thereby rendered inadmissible, is that in the trial of a criminal case the court should not stop to form an issue to determine the collateral question of the source of the evidence; but that theory has no application here, because the effort to have the evidence suppressed is not put forth in a criminal case; but in a civil cause an injunction is asked which has the purpose and, if granted, would have the effect of suppressing the evidence, so obtained, in criminal cases, some of which seem to be threatened and others now pending. The question before the court, therefore, was not collateral to the question of a defendant's guilt.

"The rule just suggested was applied by the Supreme Court of the United States in Adams v. New York, supra; but in the case of Weeks v. United States, supra, evi-

dence obtained by unlawful search was held to be inadmissible, and the Adams Case was distinguished by the fact that there the objection to the admission of the evidence was first made at the trial, while in the Weeks Case a motion had been made for the return of the seized evidence prior to the trial. The distinction so made has been frequently criticized on the ground that the issue as to the source of the evidence did not cease to be collateral simply because it was raised and determined ahead of the main issue; but, even if that criticism be well founded, it has no application here for the reason already stated, that in the case before us the issue as to the source of the evidence is not raised in a criminal case at all.

"It was furthermore said in the Weeks Case that 'if letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.' But if that be true, it would logically follow that the law prohibiting the forceful invasion of one's home by an individual 'is of no value' and 'might as well be stricken'; but we never have heard and never expect to hear that argument advanced. Under the law both the citizen and the state have their remedies. To hold the evidence admissible is not to sanction the unlawful search and seizures (unless the guaranty is one against conviction on evidence so obtained, a proposition hereafter discussed), since the injured citizen has his remedy for the trespass.

"Again there can be no question but that evidence obtained on a search and seizure which violates the constitutional guaranty is obtained unlawfully; but if we should hold that the mere unlawfulness of its procurement renders it inadmissible, then, in order to be consistent, if the question should arise, we must necessarily hold evidence inadmissible which has been obtained on a trespass by a private individual, because such trespass is also unlawful. But the books all say, without exception so far as we have been able to find, that evidence obtained unlawfully by a private individual is not thereby rendered inadmissible.

So, if it is to be held that the evidence under consideration is inadmissible, it must be on some other ground than merely that it was unlawfully obtained.

"It appears to us that the correct solution of the problem depends on a determination of the object sought to be attained by the people in adopting the guaranty against unreasonable searches and seizures. If the object was to 'prevent violations of private security in person and property and unlawful invasion of the sanctity of the home of the citizen by officers of the law, acting under legislative or judicial sanction, and to give remedy against such usurpations when attempted' (Adams v. New York, supra), then the violation of the citizen's constitutional right has been completed with the completion of the invasion, and the evidence so obtained stands on the same basis as any other evidence obtained unlawfully. If, on the other hand, the object was to guarantee the citizen against conviction by evidence obtained through an unreasonable search and seizure, the evidence so obtained stands on an altogether different footing, and its admission becomes the gist of the violation, and the violator would be, not the officer who made search, but the judge who admits the evidence.

"Notwithstanding the language of the Supreme Court of the United States in the Adams Case, quoted supra, it would seem that the more recent development of the rule in that court requires that the Fourth Amendment to the Constitution of the United States be made by construction to read somewhat as follows:

" 'The right of the people to be secure against conviction of crime on evidence obtained in whole or in part by unreasonable searches and seizures shall not be violated and no warrants shall issue but upon probable cause, supported by oath or affirmation, and properly describing the place to be searched and the persons or things to be seized.'

"No one case has been found using this language but, taking into consideration the language of the opinions of the several cases through which the rule has been developed, we believe it must be said that the final federal interpretation of the Constitution is as we have indicated. The Adams Case has never been specifically overruled,

but, if not overruled in effect, it has at least been distinguished to death.

"The case to which jurists have looked as the historical foundation for the guaranty is Entick v. Carrington, 19 How. St. Tr. 1029, decided in 1765, just eleven years prior to the separation. That was an action for damages brought by one whose premises had been searched for evidence under an illegal warrant, against the officials making the search. Nothing was said in the argument of counsel, or in the opinion of the court, relative to the immunity of the subject from conviction on evidence so obtained, and, as already suggested, if that had been the object of the guaranty, it would seem that the wrong done was by the court in the admission of the evidence and not in the action of the officers in searching for and seizing it. The latter, however, were the defendants.

"The Boyd Case quotes extensively from Lord Camden's opinion, from which it plainly appears that the general warrant under which the search had been made was illegal, and that Entick whose premises had been searched for evidence of seditious libel, was entitled to maintain an action in damages for trespass against the officers acting under the illegal warrant; but neither in the quotation nor in any other part of his Lordship's opinion do we find anything to justify the use of that case as authority for holding that evidence obtained by an unlawful search is thereby rendered inadmissible against the party searched; but there is language which seems to throw some light upon the object sought to be attained in insisting on and obtaining a guaranty against unreasonable searches and seizures; and, if we be correct in our interpretation of the language used, the case is rather authority for a conclusion directly contrary to that reached by the Supreme Court of the United States. Lord Camden said:

" 'Lastly, it is urged as an argument of utility, that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shewn, where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence, there is no way to get it back but by action.

" 'In the criminal law such a proceeding was never heard of; and yet there are some crimes, such for instance as murder, rape, robbery, and house-breaking, to say nothing of forgery and perjury, that are more atrocious than libelling. But our law has provided no paper-search in these cases to help forward the conviction.

" 'Whether this proceedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say.

" 'It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty.'

"Now what reason is it that his Lordship assigns for the rule that a search for evidence is disallowed? He says it is for the same reason that one will not be obliged to accuse himself 'because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust,' and the unescapable construction of his language is that a search for evidence is disallowed because the necessary means of securing it falls upon the innocent as well as the guilty and would be both cruel and unjust. Now, wherein would a search for evidence be cruel and unjust to the innocent? Surely not by its admission, because, in the ordinary case at least, as in the case where his Lordship was speaking, a search of the innocent would disclose no evidence and there would be none to admit. The hardship in the admission, if it is a hardship, would fall only on the guilty; but the means of obtaining it would be cruel and unjust to the innocent, because his privacy would be as much disturbed by the search as would the privacy of the guilty. It is the means of obtaining the evidence, and not the subsequent use made thereof, that results in cruelty and injustice to the innocent.

"Of further historical interest and assistance in determining the object of the people in adopting the guaranty is the fact that James Otis, a native of Massachusetts, in a trial in Boston, held some thirty years before the adoption of the Fourth Amendment to the Federal Constitution, testing the legality of the writs of assistance then

being used by officers of the Crown as a means for securing evidence against the Colonists, made a speech which 'set fire to a torch which is still burning, and which will continue to burn, for in that masterful effort he impressed upon the American heart the great lesson of resistance to tyranny and outrage.' 2 Watson on the Constitution, 1415. It was largely due to the powerful influence of this speech that the Fourth Amendment came to be adopted. Id. In his speech, the pertinent part of which is quoted in 2 Watson, beginning at page 1416, he argued that everyone armed with such a warrant or writ may be a tyrant in a legal manner and may control, imprison or murder anyone within the realm, and is accountable to no person for his doings; that every man might thereby reign secure in his petty tyranny and spread terror and desolation around him, and might in the daytime enter all houses, etc., at will and command all to assist him. And:

" 'Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege. Custom-house officers may enter our houses when they please; we are commanded to permit their entry. Their menial servants may enter, may break locks, bars, and everything in their way; and whether they break through malice or revenge, no man, no court, can inquire. * * * What a' scene does this open! Every man prompted by revenge, ill humor, or wantonness to inspect the inside of his neighbor's house, may get a writ of assistance. Others will ask it in self-defense; one arbitrary exertion will provoke another, until society be involved in tumult and in blood.'

"Nothing in this speech suggests that the opposition to the writs of assistance was based on the right of criminals to be immune from conviction through evidence obtained by the writ. Massachusetts, then, may be said to be the American birthplace of the Fourth Amendment to the Federal Constitution and similar provisions of the various state Constitutions, and that commonwealth early adopted and has since consistently adhered to the rule that evidence obtained by an unlawful search is not thereby rendered inadmissible, as disclosed by a line of cases from Com. v. Dana, 2 Metc. (Mass.) 329, decided in 1841, to Com. v. Donnelly, 246 Mass. 507, 141 N. E. 500, decided in 1923.

"Notwithstanding our great respect for the learning of the several high courts which have held to the contrary,

we have been brought to the conclusion that the object of the constitutional guaranty against unreasonable searches and seizures is not to prevent the use of a citizen's private papers as evidence against him, but to make unlawful the governmental invasion of his premises and privacy and the taking of his goods, irrespective of what is done with or the use made of them. The innocent could derive no benefit from an interpretation of the constitutional guaranty into the rule of evidence contended for, and surely the guilty are not entitled to, and were never intended to be given a benefit and protection which are not shared equally by the innocent. That could be justified only by what Mr. Jeremy Bentham, in discussing the privilege against self-incrimination (Wig. on Ev. [2d Ed.] § 2251), called the Fox Hunter's Reason. His argument is more pertinent to the present discussion than to a discussion of the guaranty against self-incrimination, and doubtless would have been put forward against the rule of evidence contended for, had he ever heard it claimed that evidence obtained by unreasonable search was inadmissible against the party searched. He said:

" 'The Fox Hunter's Reason—This consists in introducing upon the carpet of legal procedure the idea of 'fairness,' in the sense in which the word is used by sportsmen. The fox is to have a fair chance for his life: he must have (so close is the analogy) what is called 'law'—leave to run a certain length of way for the express purpose of giving him a chance for escape. While under pursuit, he must not be shot: it would be as 'unfair' as convicting him of burglary on a hen-roost in five minutes' time, in a court of conscience. In the sporting code, these laws are rational, being obviously conducive to the professed end. Amusement is that end; a certain quantity of delay is essential to it; dispatch, a degree of dispatch reducing the quantity of delay below the allowed minimum, would be fatal to it * * * (in this view) to different persons, both a fox and a criminal have their use; the use of a fox is to be hunted; the use of a criminal is to be tried.'

"Our conclusion is that the evidence under consideration is not inadmissible on account of the means by which it was obtained, and the trial court was correct in denying the petition for its suppression.

"Nothing that we have said in this opinion is intended to excuse or condone the unlawful search and seizure which produced the evidence under consideration. Notwithstanding we have concluded that the evidence is not

rendered inadmissible by the method of its procurement, it still remains as a fact that the appellant's constitutional rights have been flagrantly violated. Just what remedies he has it would not be proper for us to decide in this case. Some of the authorities indicate that possibly the remedies are the same as against any other trespasser.

"It follows that the order and judgment of the court below should be affirmed, and it is so ordered."

Adhering to the foregoing opinion, in which the court, as then constituted, was unanimous, we cannot sustain the contention that the ruling here complained of is subversive of either of the constitutional immunities in question. As to compulsory self-incrimination, we see no reason to modify what was said in State v. Barela, supra. As to unreasonable searches and seizures, the Constitution still stands as a protection against legislative or judicial acts calculated to authorize them.

Since former Justice Botts wrote the foregoing, the controversy has been renewed in the Supreme Court of the United States; resulting in a five to four decision. Olmstead v. United States, 277 U. S. 438, 48 S. Ct. 564, 575, 72 L. Ed. 944. The majority hold that the limit of construction of the Fourth and Fifth Amendments was reached in Gouled v. U. S. supra. The minority seem to hold that whatever constitutes invasion of privacy and comes within the spirit of the Fourth Amendment, and is an instance of the evil sought to be avoided, must be stopped by the courts, and must not be permitted to aid in the enforcement of the criminal laws. Mr. Justice Holmes goes so far as to say that he cannot distinguish "between the government as prosecutor and the government as judge." As between the two views reflected in the several opinions, we sense a striking difference. The first thought of the minority is to purify justice and prevent what Mr. Justice Holmes calls "dirty business." The majority, while not surrendering ground already taken, is concerned for the difficulty put in the way of law enforcement, and would not increase it by more liberal construction.

It is to be regretted that those concerned in law enforcement so frequently disregard individual rights. It

is also matter for painful reflection that law enforcement is becoming increasingly difficult. It is easy, in zeal to check one evil, to promote the other. This we desire to avoid. We would not minimize the high importance or the sacred character of the constitutional guaranties; nor offer a premium for violating them. Nor would we offer an easy means of escaping the consequences of crime. To check the one evil without adding to the other the two must be separately dealt with. When called upon to determine the guilt or innocence of an accused person, we need the evidence. It seems illogical to suppress it, either as compensation for a trespass, for which the law affords another remedy, or as punishment for "dirty business" by court officials, whom the courts have other means of disciplining. If other remedies are required, let the Legislature devise them.

In the case at bar the sheriff who obtained the writ and served it is said not to have made sufficient showing of probable cause. That probable cause existed is demonstrated by the return. He found that the warrant erroneously described the premises as "Lot 8" and altered it to read "Lot 6." In law he committed a trespass, and is answerable for it according to the enormity of his offense and the injury inflicted, as a jury shall determine. Does not that satisfy the Constitution? What has that to do with the question before the court in this case? According to the rule contended for, appellant would go free, and the trespass would probably never be heard from again. Neither the private nor the public wrong would be properly redressed, but one would, in effect, offset the other. Appellant is no less guilty because he has been the victim of an unlawful search. The unlawful search is still a trespass, though it has resulted in appellant's conviction. Appellant should still be punished, though entitled to compensation according to the circumstances of the case and the injury done.

It would indeed be highly desirable if there were uniformity in the state and federal courts, particularly in view of the concurrent powers of Congress and the states in the enforcement of the Eighteenth Amendment. If by adhering to the federal rule uniformity could be attained,

we should perhaps do so. But that result is not now in prospect. The slight contribution which we could make to uniformity is more than offset by the enhanced difficulty in law enforcement. If the constitutional rights of the people were really involved, practical considerations would be excluded. Considering that they are not involved, and considering it as a choice between evils, we choose what we deem the lesser.

Section 4a, c. 89, Laws 1927, then in force, provided that

"* * * the evidence obtained by reason of any search warrant may be used in any court of competent jurisdiction, in any action brought under the provisions of this Act."

It is urged that, by implication, this section prohibits the use of evidence obtained by use of an illegal search warrant. We do not think so. The quoted portion of the section is affirmative in form. Such would have been the rule without legislative declaration of it. In such cases the stated condition is not deemed exclusive. State v. Trujillo, 33 N. M. 370, 266 P. 922. It could not have been intended that no evidence should be received in a prohibition case except such as had been obtained by means of a search warrant.

The judgment should be affirmed and the cause remanded. It is so ordered.

BICKLEY, C. J., and PARKER, J., concur.

CATRON and SIMMS, JJ., did not participate.