BOWDEN v. STATE.

No. A-11320. July 16, 1952.

(246 P. 2d 427.)

Harry Seaton, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. Plaintiff in error, Alva Franklin Bowden, defendant below, was charged by information in the district court of Tulsa county, Oklahoma, with the commission of the crime of first degree manslaughter allegedly committed on January 14, 1949, at about 1:30 p. m., in Tulsa county, Oklahoma. The information charges, in substance, that the defendant, while under the influence of intoxicating liquor, drove on a public highway, Title 47, § 93, O.S.A. 1941, an International trailer motor truck head-on into and against a 1940 Packard 2-door sedan, occupied by Eunice Kellogg as a passenger, inflicting upon her certain mortal wounds from which she died. The defendant was tried by a jury, convicted, and which jury fixed his punishment at 20 years in the penitentiary, upon which judgment and sentence was entered accordingly, and from which this appeal was perfected, on April 17, 1951. Brief on behalf of the state was filed herein on February 28, 1952, completing the issues herein.

The evidence on behalf of the state amply supports the charge that the defendant was driving while under the influence of intoxicating liquor. Mr. Clyde Greever, the defendant's employer, Mattie Highfill, Leonard Bates, E. A. Cummings, State Highway Patrolman, Brick Fowler, investigator for the county attorney's office, K. O. Herwig, instructor in the Oklahoma School of Business, all of whom saw and observed the defendant, either at the time of the accident or within a short time thereafter, testified that the defendant was drunk. They testified that they based this conclusion upon his face being flushed, that he staggered when he walked, that he had difficulty in lighting his cigarette, that his speech was slow and thick, and that they smelled intoxicating liquor on his breath; otherwise, the witnesses testified strongly and positively to the effect defendant was drunk, exclusive of evidence in relation to blood and urine tests to determine alcoholic blood content, hereinafter referred to as made by Dr. Beddo. Mr. W. H. Windsor was at the collision and said the defendant was drunk and that the truck was still running after the collision and he reached in and turned off the truck ignition, and there was a strong odor of liquor in the truck cab. The truck driver was still in the cab at the time. He got out, however, and left the scene, but was overtaken by the officers as he was running across a field in a drunken dog trot, unable to keep his footing falling down a time or two.

However, there is a conflict in the record in the testimony of some of the state's witnesses relative to whether they could smell intoxicating liquor on the defendant's breath. This conflict is further amplified by the fact that some of the defendant's witnesses said they could not smell any intoxicating liquor on the defendant's breath. Mr. Greever, investigator, Brick Fowler and Mattie

Highfill said the defendant was chewing tobacco. Mr. Greever said, it was "running down his face". Leonard Bates said he was chewing gum and unwrapping more gum and chewing it. Dr. Beddo's testimony is to the effect that the tobacco and sugar contained in the gum completely obscures the odor of alcohol and gives a distinctive odor to the breath. Most of the witnesses who testified for the defendant said that he was not drunk and had no smell of intoxicating liquor upon his breath, but they were persons who saw him some considerable time after the collision, some of whom did not see him such as the two jailers until he was placed in jail. Hence, the discrepancy in the testimony relative to being able to smell intoxicating liquor on the defendant's breath may be accounted for, in the difference in the acuteness of the sense of smell in persons, combined with the fact that the defendant was doing what was designed to destroy the evidence of the alcoholic odor of his breath.

In this connection, it is well to observe that the record shows the defendant got back from a trip about 2:00 or 3:00 p. m. Friday and didn't work any more that week. The defendant had Mr. Greever's truck, supposedly at his house. Bowden called Mr. Greever about 12:30 p. m. on Saturday, the day of the collision, and said he was going hunting. Mr. Greever informed him to bring the truck over to the yard, he didn't want the truck on a hunting trip. Of course, the defendant, if drinking intoxicating liquor, wanted to obscure his alcoholic breath from his employer, hence he was prepared so to do, with both his chewing tobacco and his purposely possessed chewing gum. It is apparent that this conduct indicates the defendant knew what he was doing. These facts certainly weaken the defendant's testimony that he was the victim of an epileptic black-out and didn't know what he was doing.

As hereinbefore indicated the defendant's defense was that he was suffering an epileptic seizure or black-out, and that he was not drunk. He did admit that he had gone to the grocery that morning and bought some "pork and beans and maybe some beer". He testified he blacked out before the collision, and did not recall anything until he came to in the hospital about the middle of February. It appears he was taken there because of a highly nervous state and irrational condition. One jailer, John Sherill, testified that in his opinion the defendant was not drunk, but there was something wrong with him. Another jailer, John H. Whitaker, testified the defendant fell on his head about two weeks before trial or the middle of April in the jail, and was unable to perform his duties for several day. His lawyers testified to his inability to recognize them or to exercise the responsibilities of a client. A nurse testified he was in the hospital for 13 days after his imprisonment. He testified not clearly but at length as to his past history of epileptic black-outs.

Members of defendant's family and other witnesses testified as to his seizures and drinking. Garland Bowden, a brother of defendant, testified he never did see the defendant have a black-out, but he was told about them. Joella Fay Bowden, the defendant's 19-year old daughter, said she had seen her father have 3 or 4 black-outs at home. She told of one incident when he laid his paper down, put his hands to his head and began to shake all over, and went to the bed and laid down. She said she had seen her father under the influence of intoxicating liquor, also, but denied he had been drinking the day in question. Mrs. Maudie Bowden, defendant's wife, testified she had seen her husband under the influence of intoxicating liquor, but said he was not drinking the day in question. When asked if the defendant was not a pretty heavy drinker she answered, "I have seen him drink occasionally". She said he had been under the influence of intoxicating liquor a number of times since August 28, 1948. She testified she had seen him black-out, that at such times he put his hands to his head, and said his head hurt and he complained of being dizzy;

and they got him to lay down and go to bed. The last one she remembered occurred she said about a year ago. The first one was about eight years ago; that she called a doctor then, but since then the record shows no medical aid has been sought but the defendant said he took some patent medicine, "Nervine". Mrs. Dorothy Virginia Howser, the defendant's landlady, testified she saw the defendant practically all morning from breakfast time, until after he called Mr. Greever about the truck. She said he was not drinking that morning, and gave no evidence of it, but admitted on occasions she had seen him drinking. She admitted she had seen him drunk twice. At various times she had seen him drinking "because he is quite a heavy drinker", especially since September, 1948, he has been a pretty· consistent drinker. She did not testify in relation to any seizures. Minnie A. Young, a nurse, testified she saw the defendant about February 1, 1949, and thereafter for about 13 days in the hospital, and he was in a highly nervous and irrational state. She never testified the defendant was afflicted with epilepsy. It appears Dr. Underwood attended him while he was in the hospital but was not called to testify. The failure of the nurse to identify the defendant's condition as epilepsy and the defendant's failure to call the doctor to ·so testify if he would have so diagnosed his case, left the defendant's claim of epilepsy a matter of speculation, unsupported by medical proof. These and the foregoing facts presented an issue of fact for the determination of the jury. It did not believe the defendant's evidence. The defendant admits that this court and other courts have held that the weight of the testimony is for the jury. Such is the law. It is a fact that the jury as the trier of the facts in weighing the testimony might have decided this case either way. In such a situation we are bound by the jury's finding. This court has repeatedly held that where there is a conflict in the evidence from which different inferences may be drawn it is the exclusive province of the jury to weigh the evidence and determine the facts. Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479. This rule has been announced so many times that it is axiomatic. On the issue of drunkenness the record supports the jury's findings and it is conclusive on this court.

In the final analysis, the defendant says, "the entire case may be determined on the single proposition * * * that the constitutional rights of the defendant were invaded by the unlawful taking of the samples of his urine and blood" to determine his state of intoxication. This question presented a question of law, first to be determined by the court out of the hearing of the jury, as to whether the defendant's consent to the taking of the test was voluntarily given. State v. Duguid, 50 Ariz. 276, 72 P. 2d 435:

" * * * Whether accused voluntarily furnished sample of urine for analysis was preliminary question for trial court, * * *."

This procedure was not pursued herein. The trial court took a great risk of reversible error in not so determining before submitting the evidence to the jury. However, the record supports the proposition the blood and urine samples were voluntarily given. The error thus risked in this instance is harmless. The evidence on this issue was in substance as follows. In this connection it must be recalled that the accident occurred about 1:30 p.m. The record shows, Dr. Beddo took the defendant under observation at 4:00 p.m. and kept him until about 4:32 p.m. Dr. Beddo said when he saw him he was chewing a mixture of tobacco and chewing gum. It will be noted that about three hours had transpired from the time of the collision and the defendant had sobered up to a great degree. Then it was, he was prepared for the blood and urine tests. The record discloses that Dr. Beddo in the presence of the assistant county attorney, highway patrolman, Cummings and Brick Fowler, county investigator, advised the defendant of his rights to the effect that he did not

have to make a statement and that it might be used against him, etc. Dr. Beddo testified the defendant said he sustained no injuries and suffered no pain in the collision, and he appeared to understand the conversation and its significance, that his conversation was rational and concerned with the points in question. Dr. Beddo stated he did not think the defendant was so drunk he did not know what he was talking about. Dr. Beddo's evidence alone was sufficient on this issue to allow the trial court to permit the evidence to go to the jury for its consideration as to whether or not the consent was voluntary, to be considered along with the other evidence as to the results of the tests. These tests showed the presence of .15% alcoholic blood content and .32% alcoholic urine content in the defendant's urine, either of which Dr. Beddo and Mr. Rogers, State Chemist, testified would indicate that at the time of the collision the defendant was intoxicated, and an unsafe driver. These tests were taken as hereinbefore indicated about 4:30 p.m., or three hours after the collision, hence the greater alcoholic content in the urine which the record shows will occur when one begins to sober up. In light of this evidence, we are of the opinion it was sufficient upon which both the court and the jury could conclude that the tests were voluntarily consented to. In Toms v. State, 95 Okla. Cr. 60, 239 P. 2d 812, we said:

"In a drunk driving case where drunkometer breath and urine tests are consented to voluntarily, the alcoholic content of both an accused's breath and his urine was a matter not within the ordinary training or intelligence of the average juror, hence not only the facts, but the conclusions in relation thereto, were matters of professional or scientific knowledge or skill, concerning which qualified experts are permitted to give testimony."

See Halloway v. State, 146 Tex. Cr. R. 353, 175 S. W. 2d 258, 159 A. L. R. 220, as follows:

"Laboratory report showing alcoholic content of urine of one charged with driving an automobile while intoxicated was admissible over objection that specimen was involuntarily given if accused was intoxicated when he consented thereto, where it did not appear that accused was so intoxicated as to be incapable of understanding officer's warning that he need not give specimen and, if given, it would be used against him."

See, also, State v. Morkrid, Iowa, 286 N.W. 412, 127 A.L.R. 1514. Such is the situation confronting the court in the case at bar. It does not appear, because of the lapse of time from the collision to the tests in which the defendant had about three hours to sober up, and in light of the evidence as to the defendant's condition when the consent was given to make the urine test, that the defendant was incapable of understanding the officer's warning that he need not give the specimen against his will, and that if he did give it it might be used against him. Furthermore, the record shows that the defendant insisted upon the test being given, admitting that he had been drinking but contending that he was not drunk. For these reasons we hold that from the record it does not appear that the defendant was so intoxicated as to be incapable of understanding what he was doing and being aware of the fact that this evidence could be used against him.

The evidence of the epileptic seizure except for the defendant's testimony is all confined to times either before the collision or after the defendant's imprisonment, which would not affect the conditions at the time of the collision. This evidence as to an epileptic seizure at the time of the collision presented a controverted issue of fact for the jury, with an adverse holding to the defendant. The jury concluded, as they had a right to do, that the defendant was using a condition precedent and subsequent as a defensive device, not founded on truth.

No doubt this conclusion was buttressed by the fact the record shows the defendant was convicted in 1941 of larceny of livestock, and was sentenced to 2 years in the penitentiary and served 14 months therein. The defendant admitted he paid a fine for drunkenness on January 21, 1946, and paid a fine of $13 for reckless driving. As hereinbefore said, we are bound by its finding, particularly where there is ample evidence to support it. For all the above and foregoing reasons, the judgment and sentence herein imposed is accordingly affirmed.

JONES and POWELL, JJ., concur.