## BREITHAUPT *v.* ABRAM, WARDEN.

No. 69.   Argued December 12–13, 1956.—Decided February 25, 1957.

*F. Gordon Shermack,* acting under appointment by the Court, 352 U. S. 1032, argued the cause and filed a brief for petitioner.

*Richard H. Robinson,* Attorney General of New Mexico, and *Walter R. Kegel,* Assistant Attorney General, argued the cause for respondent. With him on the brief were *Paul L. Billhymer,* Assistant Attorney General, and *Dean S. Zinn.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner, while driving a pickup truck on the highways of New Mexico, was involved in a collision with a passenger car. Three occupants of the car were killed and petitioner was seriously injured. A pint whiskey bottle, almost empty, was found in the glove compartment of the pickup truck. Petitioner was taken to a hospital and while he was lying unconscious in the emergency room the smell of liquor was detected on his breath. A state patrolman requested that a sample of petitioner's blood be taken. An attending physician, while petitioner was unconscious, withdrew a sample of about 20 cubic centimeters of blood by use of a hypodermic needle. This sample was delivered to the patrolman and subsequent laboratory analysis showed this blood to contain about .17% alcohol.

Petitioner was thereafter charged with involuntary manslaughter. Testimony regarding the blood test and its result was admitted into evidence at trial over petitioner's objection. This included testimony of an expert that a person with .17% alcohol in his blood was under the influence of intoxicating liquor. Petitioner was convicted and sentenced for involuntary manslaughter. He did not appeal the conviction. Subsequently, however, he sought release from his imprisonment by a petition for a writ of habeas corpus to the Supreme Court of New Mexico.[1] That court, after argument, denied the writ.

---

[1] Petitioner sought and was denied a writ of habeas corpus from the District Court for Santa Fe County, New Mexico, on March 7, 1952.

58 N. M. 385, 271 P. 2d 827 (1954). Petitioner contends that his conviction, based on the result of the involuntary blood test, deprived him of his liberty without that due process of law guaranteed him by the Fourteenth Amendment to the Constitution. We granted certiorari, 351 U. S. 906, to determine whether the requirements of the Due Process Clause, as it concerns state criminal proceedings, necessitate the invalidation of the conviction.

It has been clear since *Weeks* v. *United States,* 232 U. S. 383 (1914), that evidence obtained in violation of rights protected by the Fourth Amendment to the Federal Constitution must be excluded in federal criminal prosecutions. There is argument on behalf of petitioner that the evidence used here, the result of the blood test, was obtained in violation of the Due Process Clause of the Fourteenth Amendment in that the taking was the result of an unreasonable search and seizure violative of the Fourth Amendment. Likewise, he argues that by way of the Fourteenth Amendment there has been a violation of the Fifth Amendment in that introduction of the test result compelled him to be a witness against himself. Petitioner relies on the proposition that "the generative principles" of the Bill of Rights should extend the protections of the Fourth and Fifth Amendments to his case through the Due Process Clause of the Fourteenth Amendment. But *Wolf* v. *Colorado,* 338 U. S. 25 (1949), answers this contention in the negative. See also *Twining* v. *New Jersey,* 211 U. S. 78 (1908); *Palko* v. *Connecticut,* 302 U. S. 319 (1937); *Irvine* v. *California,* 347 U. S. 128 (1954). New Mexico has rejected, as it may, the exclusionary rule set forth in *Weeks, supra. State* v. *Dillon,* 34 N. M. 366, 281 P. 474 (1929). Therefore, the rights petitioner claims afford no aid to him here for the fruits of the violations, if any, are admissible in the State's prosecution.

Petitioner's remaining and primary assault on his conviction is not so easily unhorsed. He urges that the conduct of the state officers here offends that "sense of justice" of which we spoke in *Rochin* v. *California,* 342 U. S. 165 (1952). In that case state officers broke into the home of the accused and observed him place something in his mouth. The officers forced open his mouth after considerable struggle in an unsuccessful attempt to retrieve whatever was put there. A stomach pump was later forcibly used and among the matter extracted from his stomach were found narcotic pills. As we said there, "this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities." *Id.,* at 172. We set aside the conviction because such conduct "shocked the conscience" and was so "brutal" and "offensive" that it did not comport with traditional ideas of fair play and decency. We therefore found that the conduct was offensive to due process. But we see nothing comparable here to the facts in *Rochin.*

Basically the distinction rests on the fact that there is nothing "brutal" or "offensive" in the taking of a sample of blood when done, as in this case, under the protective eye of a physician. To be sure, the driver here was unconscious when the blood was taken, but the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right; [2]

---

[2] It might be a fair assumption that a driver on the highways, in obedience to a policy of the State, would consent to have a blood test made as a part of a sensible and civilized system protecting himself as well as other citizens not only from the hazards of the road due to drunken driving, but also from some use of dubious lay testimony. In fact, the State of Kansas has by statute declared that any person who operates a motor vehicle on the public highways of that State shall be deemed to have given his consent to submit to a chemical

and certainly the test as administered here would not be considered offensive by even the most delicate. Furthermore, due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of "decency and fairness" that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process. The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence.[3] We therefore con-

---

test of his breath, blood, urine, or saliva for the purpose of determining the alcoholic content of·his blood. If, after arrest for operation of a motor vehicle while under the influence of intoxicating liquor, the arresting officer has reasonable grounds for the arrest, and the driver refuses to submit to the test, the arresting officer must report this fact to the proper official who shall suspend the operator's permit. Kan. Gen. Stat., 1949 (Supp. 1955), § 8–1001 through § 8–1007.

[3] Forty-seven States use chemical tests, including blood tests, to aid in the determination of intoxication in cases involving charges of driving while under the influence of alcohol. Twenty-three of these States sanction the use of the tests by statute. These, for the most part, are patterned after § 11–902 of the Uniform Vehicle Code prepared by the National Committee on Uniform Traffic Laws and Ordinances. This section makes it unlawful to operate a motor vehicle while under the influence of intoxicating liquor. The finding of the presence of a certain percentage of alcohol, by weight, in the blood of a person gives rise to a presumption that he was under the influence of intoxicating liquor. The twenty-three state statutory provisions include: Ariz. Rev. Stat. Ann., 1956, § 28–692; Del. Code Ann.,

clude that a blood test taken by a skilled technician is not such "conduct that shocks the conscience," *Rochin, supra,* at 172, nor such a method of obtaining evidence that it offends a "sense of justice," *Brown* v. *Mississippi,* 297 U. S. 278, 285–286 (1936).[4] This is not to say that the

1953 (Cum. Supp. 1956), Tit. 11, § 3507; Ga. Code Ann., 1937 (Cum. Supp. 1955), § 68–1625; Idaho Code, 1948 (Cum. Supp. 1955), § 49–520.2; Burns' Ind. Stat. Ann., 1952 (Cum. Supp. 1955), § 47–2003; Kan. Gen. Stat., 1949 (Supp. 1955), § 8–1001 through § 8–1007; Ky. Rev. Stat. Ann., 1955, § 189.520; Me. Rev. Stat., 1954, c. 22, § 150; Minn. Stat. Ann., 1945 (Cum. Supp. 1956), § 169.12; Neb. Rev. Stat., 1943 (Reissue of 1952), § 39–727.01; N. H. Rev. Stat. Ann., 1955, § 262:20; N. J. Stat. Ann., 1937 (Cum. Supp. 1955), § 39:4–50.1; McKinney's N. Y. Laws, Veh. and Traffic Law, § 70 (5); N. D. Laws 1953, c. 247; Ore. Rev. Stat., 1955, § 483.630; S. C. Code, 1952, § 46–344; S. D. Code, 1939 (Supp. 1952), § 44.0302–1; Tenn. Code Ann., 1955, § 59–1032 to § 59–1033; Utah Code Ann., 1953, § 41–6–44; Va. Code, 1950 (Supp. 1956), § 18–75.1 to § 18–75.3; Wash. Rev. Code, 1951, § 46.56.010; Wis. Laws 1955, c. 510; Wyo. Comp. Stat., 1945 (Cum. Supp. 1955), § 60–414. Other States have accepted the use of chemical tests for intoxication without statutory authority but with court approval. See, *e. g., People* v. *Haeussler,* 41 Cal. 2d 252, 260 P. 2d 8 (1953) (blood); *Block* v. *People,* 125 Colo. 36, 240 P. 2d 512 (1951) (blood); *Touchton* v. *Florida,* 154 Fla. 547, 18 So. 2d 752 (1944) (blood); *Illinois* v. *Bobczyk,* 343 Ill. App. 504, 99 N. E. 2d 567 (1951) (breath); *Iowa* v. *Haner,* 231 Iowa 348, 1 N. W. 2d 91 (1941) (blood); *Breithaupt* v. *Abram,* 58 N. M. 385, 271 P. 2d 827 (1954) (blood); *Bowden* v. *State,* 95 Okla. Cr. 382, 246 P. 2d 427 (1952) (blood and urine); *McKay* v. *State,* 155 Tex. Cr. R. 416, 235 S. W. 2d 173 (1950) (breath). Still other States accept the practice of the use of chemical tests for intoxication though there does not appear to have been litigation on the problem. See the summary in a report of the Committee on Tests for Intoxication of the National Safety Council, *1955 Uses of Chemical Tests for Intoxication.*

The fact that so many States make use of the tests negatives the suggestion that there is anything offensive about them. For additional discussion of the use of these blood tests see Inbau, Self-Incrimination (1950), 72–86.

[4] Several States have considered the very problem here presented but none have found that the conduct of the state authorities was

indiscriminate taking of blood under different conditions or by those not competent to do so may not amount to such "brutality" as would come under the *Rochin* rule. The chief law-enforcement officer of New Mexico, while at the Bar of this Court, assured us that every proper medical precaution is afforded an accused from whom blood is taken.[5]

so offensive as to necessitate reversal of convictions based in part on blood tests. *People* v. *Duroncelay*, 146 A. Cal. App. 96, 303 P. 2d 617 (1956); *Block* v. *People*, 125 Colo. 36, 240 P. 2d 512 (1951); *State* v. *Ayres*, 70 Idaho 18, 211 P. 2d 142 (1949) (test results were favorable to accused); *State* v. *Cram*, 176 Ore. 577, 160 P. 2d 283 (1945). See also *State* v. *Sturtevant*, 96 N. H. 99, 70 A. 2d 909 (1950); cf. *United States* v. *Williamson*, 4 U. S. C. M. A. 320, 15 C. M. R. 320 (1954). But see *Iowa* v. *Weltha*, 228 Iowa 519, 292 N. W. 148 (1940); *Wisconsin* v. *Kroening*, 274 Wis. 266, 79 N. W. 2d 810 (1956). But cf. *United States* v. *Jordan*, 7 U. S. C. M. A. 452, 22 C. M. R. 242 (1957).

The withdrawal of blood for use in blood-grouping tests in state criminal prosecutions is widespread. See, *e. g.*, *Maryland* v. *Davis*, 189 Md. 640, 57 A. 2d 289 (1948); *New Jersey* v. *Alexander*, 7 N. J. 585, 83 A. 2d 441 (1951); *Commonwealth* v. *Statti*, 166 Pa. Super. 577, 73 A. 2d 688 (1950).

Many States authorize blood tests in civil actions such as paternity proceedings. See, *e. g.*, the discussion in *Cortese* v. *Cortese*, 10 N. J. Super. 152, 76 A. 2d 717 (1950). Other States authorize such tests in bastardy proceedings. See, *e. g.*, *Jordan* v. *Davis*, 143 Me. 185, 57 A. 2d 209 (1948); *State ex rel. Van Camp* v. *Welling*, 6 Ohio Op. 371, 3 Ohio Supp. 333 (1936). For a general discussion of blood tests in paternity proceedings see Schatkin, Disputed Paternity Proceedings (3d ed. 1953), 193–282.

[5] In explanation, he advised that by regulation the state police are permitted to obtain blood for analysis only when the blood is withdrawn by a physician. He further advised that it is the customary administrative practice among municipalities to allow blood to be taken only by a doctor. In all cases a competent technician is required to make the laboratory analysis incident to the test. We were assured that in no instance had a municipality or the state police permitted the test to be made without these precautions.

The test upheld here is not attacked on the ground of any basic deficiency or of injudicious application, but admittedly is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication. Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.[6] The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.[7]

As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of

---

[6] National Safety Council, *Accident Facts 1956*, 43–71.

[7] Governors' Conference Committee, *Report on Highway Safety* (Nov. 1956); National Committee on Uniform Traffic Laws and Ordinances, *Uniform Vehicle Code* (Rev. 1956); White House Conference on Highway Safety, *Organize Your Community for Traffic Safety* (1954).

alcohol can often by this method be taken out of the confusion of conflicting contentions.

For these reasons the judgment is

*Affirmed.*

Mr. Chief Justice Warren, with whom Mr. Justice Black and Mr. Justice Douglas join, dissenting.

The judgment in this case should be reversed if *Rochin v. California,* 342 U. S. 165, is to retain its vitality and stand as more than an instance of personal revulsion against particular police methods. I cannot agree with the Court when it says, "we see nothing comparable here to the facts in *Rochin.*" It seems to me the essential elements of the cases are the same and the same result should follow.

There is much in the Court's opinion concerning the hazards on our nation's highways, the efforts of the States to enforce the traffic laws and the necessity for the use of modern scientific methods in the detection of crime. Everybody can agree with these sentiments, and yet they do not help us particularly in determining whether this case can be distinguished from *Rochin.* That case grew out of police efforts to curb the narcotics traffic, in which there is surely a state interest of at least as great magnitude as the interest in highway law enforcement. Nor does the fact that many States sanction the use of blood test evidence differentiate the cases. At the time *Rochin* was decided illegally obtained evidence was admissible in the vast majority of States. In both *Rochin* and this case the officers had probable cause to suspect the defendant of the offense of which they sought evidence. In *Rochin* the defendant was known as a narcotics law violator, was arrested under suspicious circumstances and was seen by the officers to swallow narcotics. In neither case, of course, are we concerned with the defendant's guilt or innocence. The sole problem is whether the proceeding

was tainted by a violation of the defendant's constitutional rights.

In reaching its conclusion that in this case, unlike *Rochin*, there is nothing "brutal" or "offensive" the Court has not kept separate the component parts of the problem. Essentially there are two: the character of the invasion of the body and the expression of the victim's will; the latter may be manifested by physical resistance. Of course, one may consent to having his blood extracted or his stomach pumped and thereby waive any due process objection. In that limited sense the expression of the will is significant. But where there is no affirmative consent, I cannot see that it should make any difference whether one states unequivocally that he objects or resorts to physical violence in protest or is in such condition that he is unable to protest. The Court, however, states that "the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right." This implies that a different result might follow if petitioner had been conscious and had voiced his objection. I reject the distinction.

Since there clearly was no consent to the blood test, it is the nature of the invasion of the body that should be determinative of the due process question here presented. The Court's opinion suggests that an invasion is "brutal" or "offensive" only if the police use force to overcome a suspect's resistance. By its recital of the facts in *Rochin*—the references to a "considerable struggle" and the fact that the stomach pump was "forcibly used"*—the Court finds *Rochin* distinguishable from this case. I cannot accept an analysis that would make physical resistance by a prisoner a prerequisite to the existence of his constitutional rights.

---

*Actually, the struggle in *Rochin* occurred in the defendant's home after the officers had broken in. He was arrested and taken to a hospital, and there was no evidence that he struggled there.

Apart from the irrelevant factor of physical resistance, the techniques used in this case and in *Rochin* are comparable. In each the operation was performed by a doctor in a hospital. In each there was an extraction of body fluids. Neither operation normally causes any lasting ill effects. The Court denominates a blood test as a scientific method for detecting crime and cites the frequency of such tests in our everyday life. The stomach pump too is a common and accepted way of making tests and relieving distress. But it does not follow from the fact that a technique is a product of science or is in common, consensual use for other purposes that it can be used to extract evidence from a criminal defendant without his consent. Would the taking of spinal fluid from an unconscious person be condoned because such tests are commonly made and might be used as a scientific aid to law enforcement?

Only personal reaction to the stomach pump and the blood test can distinguish them. To base the restriction which the Due Process Clause imposes on state criminal procedures upon such reactions is to build on shifting sands. We should, in my opinion, hold that due process means at least that law-enforcement officers in their efforts to obtain evidence from persons suspected of crime must stop short of bruising the body, breaking skin, puncturing tissue or extracting body fluids, whether they contemplate doing it by force or by stealth.

Viewed according to this standard, the judgment should be reversed.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, dissenting.

The Court seems to sanction in the name of law enforcement the assault made by the police on this unconscious man. If law enforcement were the chief value in our constitutional scheme, then due process would shrivel

and become of little value in protecting the rights of the citizen. But those who fashioned the Constitution put certain rights out of the reach of the police and preferred other rights over law enforcement.

One source of protection of the citizen against state action is the Due Process Clause of the Fourteenth Amendment. Our decisions hold that the police violate due process when they use brutal methods to obtain evidence against a man and use it to convict him. *Rochin* v. *California,* 342 U. S. 165; *Chambers* v. *Florida,* 309 U. S. 227. But the conception of due process is not limited to a prohibition of the use of force and violence against an accused. In *Leyra* v. *Denno,* 347 U. S. 556, we set aside a conviction where subtle, nonviolent methods had been used to exact a confession from a prisoner. For it was obvious that coercion might be the product of subtlety as well as of violence. We should take the same libertarian approach here.

As I understand today's decision there would be a violation of due process if the blood had been withdrawn from the accused after a struggle with the police. But the sanctity of the person is equally violated and his body assaulted where the prisoner is incapable of offering resistance as it would be if force were used to overcome his resistance. In both cases evidence is used to convict a man which has been obtained from him on an involuntary basis. I would not draw a line between the use of force on the one hand and trickery, subterfuge, or any police technique which takes advantage of the inability of the prisoner to resist on the other. Nor would I draw a line between involuntary extraction of words from his lips, the involuntary extraction of the contents of his stomach, and the involuntary extraction of fluids of his body when the evidence obtained is used to convict him. Under our system of government, police cannot compel people to furnish the evidence necessary to send them to prison.

Yet there is compulsion here, following the violation by the police of the sanctity of the body of an unconscious man.

And if the decencies of a civilized state are the test, it is repulsive to me for the police to insert needles into an unconscious person in order to get the evidence necessary to convict him, whether they find the person unconscious, give him a pill which puts him to sleep, or use force to subdue him. The indignity to the individual is the same in one case as in the other, for in each is his body invaded and assaulted by the police who are supposed to be the citizen's protector.

I would reverse this judgment of conviction.