## RE: BREATHALYZER MACHINES
Case Number Not Applicable
County Court, Monroe County
August 4, 1983

J. ALLISON DEFOOR II, County Judge.

DURING THE PAST six months, and generally since the adoption of last year's tough new anti-Driving Under the Influence of Alcohol laws, it has been increasingly apparent that the bulk of the Court's work in traffic court, both in numbers and difficulty, would revolve around the State's efforts to rid our State's highways of the menace of the drunk drivers. This local effort reflects a nationwide revulsion against the spectacle of the drunk driver,[1] magnified by a local concern made acute by local conditions.[2] The result has been, in the Upper and Middle Keys divisions of Monroe County Courts, literally dozens of such cases prosecuted per month.[3]

THE INCREASED PENALTIES attendant to driving while intoxicated has lead to increased efforts by the defense bar to counter the State's moves. Initially, attacks were made on the constitutionality or method of adoption of the statute itself.[4] These have been unsuccessful in this Court, to date.[5] Increasingly, the attacks have centered on the breathalyzer machines used by the Monroe County Sheriff. The Sheriff currently uses in Plantation and Marathon, the Smith & Wesson 900-A Breathalyzer Machines, which are approximately fifteen (15) years old.

THE INITIAL ATTACKS upon these machines centered upon potential radio interference. It has been demonstrated that the Model 900-A is subject to radio interference.[6] This is potentially made worse in the Keys by the intermixing at close proximity of radio transmission towers. This attack on the breathalyzer has failed, to date, not as much on its lack of possible validity as a failure of proof by the defense of specificity as to interference which may be occurring, presumably due to the expense and difficulty of obtaining the proper experts.

NOW THE FOCUS is shifting to a new area related to the breathalyzer. The Sheriff's machine takes a single sample of air, and the sample is

then lost. Increasingly, it is being asserted that the State has a duty to either preserve the sample for testing by defense experts, or preserve a separate sample for such purposes. This theory has not been ruled on by the Court but is gaining momentum statewide[7] and nationally.[8]

MORE RECENT MODELS or methods of testing breath for alcohol content avoid the problems outlined above. Fundamentally, these attacks, to date, other than constitutional ones, are predicated on the concept that the state of the art has advanced in the past fifteen years. There is now a better way to test, and we in the county have simply refused to acquire the up-to-date equipment.

BEYOND THESE TECHNICAL defenses, there is increasingly a marked divergence, in a limited number of cases, between the breathalyzer readings recorded and the apparent intoxication level reflected by the Sheriff's video tape of the physical dexterity tests each defendant is asked to perform. This has lead to several not guilty verdicts by juries, by the Court, and increasingly to nolle prosequi's by the prosecutor. While the source of these discrepancies has not been pinpointed, when coupled with the technical concerns, it has heightened the Court's concern over these two tired old machines. The Court would emphasize that it is not finding them unreliable, yet, but expresses merely an increased level of concern.

FINALLY, even assuming that the machines work properly, increasingly the precious judicial resources of this county, are beng focused upon, not guilt or innocence, but the complex workings of the breathalyzer itself. Countless hours of the time of the Court, witnesses, including sheriff's deputies, jurors, prosecutors and defense bar alike, have been squandered in reflection over such silliness as whether a Winnebago passing by outside the Plantation Key substation might trigger a false reading in a breathalyzer located therein by use of his C.B.[9] All of this could be avoided, and the confidence of the citizens in the test results and in our criminal justice system greatly enhanced, by merely acquiring up-to-date equipment.

INFORMALLY, the Court has suggested for over three months to the State and Sheriff's Department, that new equipment might be in order. None has been forthcoming. Accordingly, and with the greatest of reluctance, the Court, using its supervisory powers,[10] informs the Sheriff that beginning thirty (30) days from the date of entry of this order, the results of breath samples taken and tested by the Smith and Wesson 900-A Series Breathalyzer will no longer be admissible in the Upper and Middle Keys divisions of the Monroe County Court. It should be noted that this Order is prospective only, and is founded only upon the Court's supervisory powers, aimed at protecting the use and integrity

of judicial resources. This ruling is not, as yet, founded upon evidentiary grounds.

THE COURT WILL NOT usurp the Sheriff's job in deciding what new equipment to acquire[11] but it notes that breath-analyzing devices exist[12] which address all of the issues raised by the defense bar, locally and statewide. The Court accordingly urges the Sheriff to use care and foresight in acquiring the best of the current state of the art.

## FOOTNOTES

[1] In *State v. William Horton*, Case #82-4130-TT-A-42 (Monroe County Court, June 9, 1983), this Court at pg. 2, noted the culmination of national concern over drunk driving as reflected in the Supreme Court of the United States:

> This nationwide revulsion was ultimately noted by the Supreme Court of the United States in the case of *South Dakota v. Neville*, ____ U.S. ____, 32 Cr. L. Rep. 3047 (No. 81-1453, Feb. 23, 1983) "The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that State Courts have, has repeatedly lamented the tragedy." Id. at Cr. L. Rep. 3048. The Court had noted over 15 years ago in the case of *Breithaupt v. Abram* at 352 U.S. 432, 439 (1957) "The increasing slaughter on our highways, most of which should be avoidable, now reaches the outstanding figures only heard of on the battlefield." Accord. *Perez v. Campbell*, 402 U.S. 637, 657 and 672 (Blackmon, J. concurring): "The slaughter on the highways of this Nation exceeds the death toll of all our wars."

[2] What resident of the Keys hasn't driven behind a vehicle that he was glad wasn't oncoming. The problem of the drunk driver has been more acute in Monroe County. In 1980, there were fifty-five (55) fatalities recorded on Monroe County roads, with estimates as high as 90% of these involving intoxication on either alcohol and/or drugs.

[3] The success of the efforts against drunk driving may be found in the comparison of the highway fatality figures for 1980, note 2 supra, and 1982 (40), and Jan.—Aug. 1983 (17). All figures in notes 2 and 3 were received from the Florida Highway Patrol.

[4] As to all of the attacks to the breathalyzer, see generally 10:3 Search and Seizure Law Rep. 117 (April 1983).

[5] This Court has upheld the validity of F.S. 316.193 and the use of the breathalyzer against challenges based upon numerous grounds, see e.g., *State v. William Horton*, Case No. 824130-TT-A-42 (Monroe County Court, June 9, 1983) (challenged for alleged defects in adoption of statute by legislature, and also for failure of Dept. of Health and Rehabilitation Services to adopt timely rules to govern breathalyzer use), and *State v. Michael Wilburn*, Case No. 82-6550-TT-A-43 (Monroe County Court, Feb. 16, 1983) (Attack based upon possible radio inteference).

[6] See Customary Advisory: Guidelines for Radio Frequency Interference Testing. (Smith & Wesson, Inc., Sept. 10, 1982).

[7] See *Cook, et al. v. State*, 4 Fla. Supp.2d 184 (Sarasota Co., 1981).

[8]See *Lauderdale v. State*, 548 P.2d 376 (Alaska, 1976); *Back v. Smith*, 604 P.2d 617 (Arizona, 1979); *State v. Booth*, 295 N.W.2d 194 (Wis. App. 1980), *People v. Trombetta*, ____ P. 2d____, 33 Crim. Law Rep. 2097 (March 28, 1983 - Cal Ct. App. 3d District).

[9]Once it was suggested that the confluence of signal from Voice of America, Radio Marti and Cuban jamming transmissions "might" be warping the results of the breathalyzer. Surely the judicial system must have weightier matters to ponder.

[10]See generally *Rose v. Palm Beach County*, 361 So.2d 135 (Fla. 1978) and cases cited therein.

[11]The cost of new equipment is no doubt a concern, but given the fact that each D.U.I. conviction brings $250.00 minimum to the county's fine and forfeiture fund, there is no doubt but that the cost-benefit would be favorable. Presumably, the cost of testing might even be recoverable as costs from a convicted defendant. The Court, however, has been reassured by the Sheriff that grant monies are available for the purchase of new equipment, should the old equipment be thrown out by Court order.

[12]For instance, the Intoximeter, Inc., Interim Field Sampling Device (so-called Indium Crimper).