PIERCE, Judge.
Appellants Earl A. Giddens and Austin C. Watson, defendants below, appeal a judgment entered against them pursuant to a jury verdict in favor of appellee, plaintiff below, in the amount of $20,000.
The accident occurred about 2:30 in the morning of January 17, 1965, on U. S. Highway 41 north of Land-o-Lakes, Florida, about a quarter mile south of “Trucker’s Haven”. Defendant Giddens was driving a truck belonging to his uncle, defendant Watson, in a southerly direction, while plaintiff Cannon was driving a Chevrolet automobile also in a southerly direction and to the rear of the truck. Plaintiff rammed his Chevrolet into the rear of the truck, incurring quite severe personal injuries to himself. Defendant Giddens and his uncle Watson had driven the truck to Georgia to deliver some produce and .were en route back to Plant City. Giddens, the driver, had just passed a truck stop southbound when it occurred to him that he might be low on gasoline so he decided to turn around and go back for some gas. He pulled the truck over toward the right of the highway preparatory to turning around, and was either slightly moving or had actually stopped when the truck was hit in the rear by plaintiff’s Chevrolet
*454 Plaintiff Cannon had stopped at the “Trucker’s Haven”, after which he had left and was travelling south between 45 and 50 miles per hour when he crashed into the truck, which he had not seen until he was “a foot or two” from it. The impact was terrific, the Chevrolet coming to rest 150 feet from the point of impact and the truck being knocked some 66 feet away where it overturned. Part of the tailgate of the truck was found later in the engine of plaintiff’s Chevrolet.
Plaintiff was taken immediately to the hospital, where shortly thereafter investigating officer Hinson could tell that plaintiff had been drinking from his breath. Plaintiff arrived at the hospital about 2:56 A.M., was given blood transfusions beginning about 4:15 A.M. and about 5 o’clock A.M. a sample of his blood was withdrawn for analysis. Such laboratory analysis later showed the percentage of blood alcohol to be 0.158%, or 58% higher than the minimum amount “to render a person unable to drive an automobile”.
There was sharp conflict in the testimony between witnesses for the respective parties as to practically every factual point in the case,- except that plaintiff’s Chevrolet crashed into the rear-end of defendants’ truck in the nighttime on U. S. 19 and that plaintiff was seriously injured.
One of the crucial areas of conflict was the fact of sobriety or otherwise on the part of plaintiff at the time of impact. The critical character of this fact is because it would bear so heavily upon the issue of contributory negligence of plaintiff in the driving of his automobile. The sharp cleavage of the reciprocal testimony on this issue is shown by the adversary witnesses.
Plaintiff contended that he had had only two beers “right after dinner” at about 1 or 1:30 P.M. on the afternoon before the accident. Pie admitted going several times to the Overpass Inn where beer and liquor were served but that he “just drank cokes”. Plaintiff had several witnesses to testify to his sobriety.
On the other hand, an insurance adjuster, who interviewed plaintiff at the hospital soon after his arrival there, testified that plaintiff stated his brother was home on leave from the Navy but was going back that afternoon or evening, and that he and his brother drank beer during the afternoon at plaintiff’s home, at his brother’s home, and also “at several bars”. Asked whether plaintiff said how many beers he had that day, the witness replied “I believe he indicated about twelve. He wasn’t specific”. As before stated, an officer testified he smelled liquor or beer on plaintiff’s breath soon after his arrival at the hospital.
The wide disparagement in the testimony upon this vital point is readily discernible and points up the vigorous efforts of both sides to adduce before the jury all the evidence they could muster to advance their respective contentions as to plaintiff’s sobriety. It was in this context of the testimony that defendants offered in evidence certain depositions to show the taking of a blood sample from plaintiff at the hospital, the results of the laboratory analysis of such samples, and the translation thereof into recognized medical competence to drive. Included as a part of the deposition was a “consent form” for the drawing of the blood for a blood alcohol test, signed by the plaintiff and also signed by the attending physician who drew the blood.
When the deposition was proffered, however, plaintiff’s counsel objected and the Court sustained the objection, ruling out of the case all references to the taking of the blood tests and the results thereof. In order to give a better insight as to the views of the trial Judge we quote from the record:
“THE COURT: Gentlemen, in the absence of the Jury, let me say that I have reviewed the depositions of Dr. Frank Sidell, or Sidell, whichever it is, and also the deposition of J. E. Dickenson and have reviewed the law, and I’ll grant the motion to quash these depositions. They’ll not be presented to the Jury.
*455 * * * * * *
“It’s my opinion that this man was incapable as a matter of law to give consent to this type of alcohol test or blood test and that’s one reason. The other reason is that this obviously, although Dr. Sidell skirted the issue as rapidly and as widely as possible where he was requested by the investigating officer to make this test and it’s contrary to the provisions, and I think that under the constitutional guarantee that no man need be a witness against himself stands true in every respect and in this case here where there’s no telling at this time whether this man was going to be charged with a criminal act or whether he was going to be involved in a traffic offense and what it was. I don’t think that the results of a test of this nature can be utilized in this suit here.
“Now, you are suggesting that a man who comes in and seeks the aid of the Court cannot then scream about the use of such a thing would be true if this man was coming in trying to sustain something because of the blood evaluation and then cry because it was hurting him, but this does not hold true where * * * this is a civil action and properly covered under Chapter 317, I think it’s 17 or 21, whichever subsection that is.
“So, I think that Mr. Patterson (corrected to mean Mr. Dickenson) could testify to that which would be pertaining to something other than this blood test. He’s free to testify to this, but as to this blood test, no.”
In order to fortify their objection to the Court’s ruling and to preserve the benefit of their legal position, the defendants proffered all such evidence into the record and the same is certified to us here along with all the other evidence that actually went to the jury.
So the question is squarely presented as to the admissibility of such blood specimen evidence. The question is not a particularly novel one: it has been before both the State and Federal Courts in several cases, in criminal cases ever more generally than in civil cases. The novelty lies in the application of the law made by the Courts to the facts of each succeeding case.
 While my personal views are directly to the contrary, and I would so rule if the case were of first impression, we must hold that under the law existing in the presently adjudicated cases, such evidence is admissible; and this, irrespective of whether consent is given, or is withheld, or is expressly denied. This latter would dispose of any contention based upon the alleged invalidity of the consent as found by the trial Judge here.
In Touchton v. State, 1944, 154 Fla. 547, 18 So.2d 752, the Florida Supreme Court had the question before it in a criminal case and, in upholding admissibility, said:
“Shortly after the collision the appellant was arrested and carried to a hospital for treatment for injuries sustained by him in the collision. While in the hospital a sample of his blood was taken and a chemical test of it was made. The result of the blood test was submitted to the jury to prove intoxication. Appellant claims that this was a violation of Sec. 12, Declaration of Rights, Florida Constitution, providing ‘No person shall be * * compelled in any criminal case to be a witness against himself * * *.’
“Constitutional inhibitions of this character grew out of the common law right of the accused against self-incrimination. The rule is set forth in 22 C.J.S., Criminal Law, § 651, that:
“ ‘Evidence resulting from a medical examination of accused for the purposes of the prosecution rather than for treatment, after an accusation has been made against him, is admissible where, in the absence of any compulsion, accused submits or consents to the examination.’
“See also Greenleaf on Evidence, 16th Ed., Sec. 469e, and Wigmore on Evidence, 3d Ed., Sec. 2263.”
*456 In Odom v. State, Fla.1959, 109 So.2d 163, the Supreme Court applied the same principle with respect to the examination of the accused’s body for presence of male sperm cells, the result of which was later admitted into evidence and used to convict him of rape, for which he was sentenced to the electric chair. Cf. State v. Wardlaw, Fla.App.1958, 107 So.2d 179.
In Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448, the U. S. Supreme Court had before it a manslaughter conviction based upon drunk driving, where “[a]n attending physician, while petitioner was unconscious, withdrew a sample of about 20 cubic centimeters of blood by use of a hypodermic needle”, which sample upon laboratory analysis showed to contain about .17% alcohol. The Court in upholding the involuntary blood test said (text 77 S.Ct. 412):
“The test upheld here is not attacked on the ground of any basic deficiency or of injudicious application, but admittedly is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication. Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.
“As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, gae of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses.”
The fifth, sixth and seventh headnotes in Breithaupt pin-point the holding:
“5. In prosecution in state court in New Mexico for involuntary manslaughter, evidence concerning result of blood test made by using blood withdrawn from defendant by physician while defendant was unconscious after accident, to determine if defendant was intoxicated, was admissible over objection that result of blood test was obtained in violation of the due process clause of the Fourteenth Amendment to the Federal Constitution, on ground that the taking was the result of an unreasonable search and seizure viola-tive of the Fourth Amendment.
“6. In prosecution in state court in New Mexico for involuntary manslaughter, admission of evidence concerning result of blood test made by using blood withdrawn from defendant by physician while defendant was unconscious after accident, to determine if defendant was intoxicated, did not compel defendant to be a witness against himself.
“7. The absence of conscious consent by driver of automobile to the taking of blood from his body by a physician while the driver was unconscious, for purpose of making a test to determine whether driver was under the influence of intoxicating liquor, without more, did not necessarily render the taking a violation of a constitutional right.”
In Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, the high Court in June, 1966, had before it a state Court conviction for driving an automobile while under the influence of intoxicating liquor, where a blood sample of the accused had been drawn at the hospital despite his vehement refusal on advice of counsel. The factual setting is stated by *457 the high Court as follows (text 86 S.Ct 1829):
“Petitioner was convicted in Los Angeles Municipal Court of the criminal offense of driving an automobile while under the influence of intoxicating liquor. He had been arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had apparently been driving. At the direction of a police officer, a blood sample was then withdrawn from petition’s body by a physician at the hospital. The chemical analysis of this sample revealed a percent by weight of alcohol in his blood at the time of the offense which indicated intoxication, and the report of this analysis was admitted in evidence at the trial. Petitioner objected to receipt of this evidence of the analysis on the ground that the blood had been withdrawn despite his refusal, on the advice of his counsel, to consent to the test. He contended that in that circumstance the withdrawal of the blood and the admission of the analysis in evidence denied him due process of law under the Fourteenth Amendment, as well as specific guarantees of the Bill of Rights secured against the States by that Amendment: his privilege against self-incrimination under the Fifth Amendment; his right to counsel under the Sixth Amendment; and his right not to be subjected to unreasonable searches and seizures in violation of the Fourth Amendment.” (Emphasis supplied).
The 24th headnote in Schmerber gives the answer to the question posed:
“24. Extraction of blood samples from accused while in hospital after being arrested for driving while under influence of intoxicating liquor was a reasonable test to measure accused’s blood-alcohol level and did not violate accused’s right under Fourteenth Amendment to be free of unreasonable searches and seizures.”
Both Breithaupt and Schmerber cite many cases upholding convictions under similar circumstances but it would be futile drudgery to further explore into them here. Suffice to say, and we reiterate, both Breit-haupt and Schmerber dealt with state Court convictions, and quite definitely established the law, at least up until the present time.
While perhaps irrelevant to this opinion and certainly to disposition of this appeal, I am impelled again to repeat that I thoroughly disagree with the law as enunciated in the foregoing cases. How the Courts can square the involuntary taking of human blood and using it to convict the unwilling donor of a crime with the Federal and State constitutional guarantees against self-incrimination, is beyond my humble comprehension.
But perhaps the future is not too bleak. In Breithaupt there were three dissenting Justices, with two dissenting opinions. In Schmerber there were four dissenting Justices, with four dissenting opinions. If this progression follows through, perhaps in the next case or two the blood-taking will be not only involuntary but also unconstitutional.
Be that as it may, upon the authority of the hereinbefore cited cases by which we are bound, the judgment herein involved must be, and is, reversed and the cause remanded for a new trial.
Reversed and remanded.
ALLEN, C. J., and SHANNON, J., concur.