227 So.2d 728 (1969)
John Edward MITCHELL, Appellant,
v.
STATE of Florida, Appellee.
No. 69-179.
District Court of Appeal of Florida. Second District.
November 5, 1969.
*729 Martin J. Jones and Joel P. Yanchuck of Earle, Jones & Chambers, St. Petersburg, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and Michael N. Kavouklis, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Acting Chief Judge.
John Edward Mitchell appeals to this Court from a jury verdict and judgment of conviction upon two counts of a four-count amended information filed against him in the Pinellas County Circuit Court.
The first and second counts of the amended information charged manslaughter of Geraldine Ione Frankovic and Florence Swenson Gunthier, respectively, by culpable negligence in the driving of an automobile. The third and fourth counts charged manslaughter of the same two respective victims, by driving while intoxicated. After trial, the jury found him guilty on the first two counts (culpable negligence), and found him not guilty on the last two counts (intoxication). The trial Court adjudged him guilty on the first two counts and sentenced him to a term of imprisonment.
Mitchell appeals here from the conviction upon the first two counts and contends principally that the trial Court erred in permitting evidence as to a blood sample taken from Mitchell at the hospital and of the alcohol chemical test of said blood sample.
On June 15, 1968 at about 10:55 P.M., Mitchell was driving his Oldsmobile automobile west on 5th Avenue South in St. Petersburg, a multi-lane highway, and entered the intersection of that street with 34th Street against a red traffic light, travelling at a rate of speed estimated variously as between 50 and 60 miles per hour by three witnesses, a Mrs. Bosy, and two police officers, Castle and Detterline, who happened to be nearby. Mitchell was on his side of 5th Avenue, the weather was clear, it was a 35 mile speed zone, traffic generally was very light, and Mitchell was driving at that time in a proper manner except for his speed and the red light. Entering 34th Street the front of his car collided with the left side of a vehicle occupied by the victims of the accident, killing them both.
Investigating police officer Powell, after initiating his investigation of the accident for his report to the Department of Safety, proceeded immediately to Mound Park Hospital to get further information to go on the report. At about this same time Mitchell was taken by ambulance to the hospital and, according to the ambulance attendant, one Gunter, "we took him out of the ambulance and rolled him into the hospital, and they designated a bed to put him, so we switched beds, put him on the hospital stretcher * * * They were starting to take a blood alcohol test * * * They were just preparing to take blood out of him, put a tourniquet around his arm *730 * * * They were just starting. I mean I can say they were finding the veins, but we left before they started, you know, put the needle in his arm. They were, you know, searching for the vein * * * Police officers were there with us." No medication or injection had been given Mitchell, who was considerably bruised and shaken up. At direction of the local police officers, a blood sample was taken from Mitchell's arm by one Javery, a laboratory technician employed by the hospital, and delivered to one of the several local police officers present, one Cohee, who had been instructed by the police department "to stand by while a blood sample was taken * * * from a defendant, and I did this". He took the sample from the technician, marked it, transported it to the local police station, and "put it in a locked box in the refrigerator". He stated he was in the hospital room "for the purpose of observing and supervising" the blood-taking "from the police officer's standpoint".
In further connection with his Department of Safety accident report, officer Powell at the hospital had asked Mitchell for his driver's license but he didn't have it with him. Two or three days later Mitchell voluntarily went to the local police station and delivered it to officer Powell in order that Powell could "complete my report".
The chemical test of the blood sample so taken showed, according to the testimony, an alcohol content indicating intoxication. On the contrary, there was no concrete evidence of Mitchell's normal physical or mental faculties, and the police officers who had personal contact with Mitchell immediately after the accident were inconclusive as to his intoxication. Officer Powell, after getting to the scene, stated he "walked over to the car, I thought I detected the odor of an alcoholic beverage. However, I couldn't be absolutely positive of that". Officer Detterline, after going over to the Oldsmobile and telling Mitchell to sit still, was asked if he detected the odor of alcohol, said "No, sir, I made no attempt to. I was concerned for the safety of the other people". Officer Castle, being asked substantially the same question, replied "I detected a moderate odor of alcoholic beverage at this time, yes, sir". An aunt of Mitchell testified she saw and observed him right after the accident in the hospital emergency room and he did not appear drunk to her at that time and she did not smell anything alcoholic on him.
Although Mitchell was acquitted of the manslaughter-intoxication counts, evidence of any inebriation on his part at the time of the accident was admissible against him under the manslaughter-culpable negligence counts. Cannon v. State, 1926, 91 Fla. 214, 107 So. 360; Hunt v. State, Fla. 1956, 87 So.2d 584; Maze v. State, Fla. App. 1964, 168 So.2d 691; Hamilton v. State, Fla.App. 1963, 152 So.2d 793. So the evidence of taking the blood sample from Mitchell and its subsequent analysis for alcoholic content assumed a critical position of importance in the case against Mitchell, even though he was convicted of manslaughter through culpable negligence rather than by reason of intoxication.
The propriety of admission of the blood sample evidence is controlled by determination of two questions: (1) whether the blood-taking violated Mitchell's constitutional rights guaranteed by §§ 4, 12, and 22 of the Florida Declaration of Rights, F.S.A., and the 4th, 5th and 14th Amendments to the Federal Constitution, and (2) whether, under the facts of his particular case, he was protected by the statutory immunity provided in F.S. § 317.171 F.S.A. If either of these propositions should be answered in the affirmative, the evidence goes out. We hold in the affirmative on both. The two matters will be discussed seriatim.

(1) The constitutional protection against self incrimination.

§ 12 of the Florida Declaration of Rights and the 5th Amendment protects a person from being "compelled in any criminal case to be a witness against himself." *731 § 22 and the 4th Amendment protects a person "against unreasonable searches and seizures." § 12 and the 5th and 14th Amendments guarantee a person "due process of law".
There is little dispute as to the essential facts. Mitchell did not consent to the blood-taking nor was he even asked. He was not under arrest for any offense. He was not even being "detained" by the police. Thus the crucial factual premise is established that Mitchell was compelled by the local police to give up his blood involuntarily, at a time when he was neither under arrest nor police detention.
The trial Court denied Mitchell's motion to suppress the blood-taking evidence upon the authority of Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.
In Schmerber, the defendant was convicted in the Los Angeles Municipal Court for the offense of driving an automobile while under the influence of intoxicating liquor. At the direction of the local police and over his protest, a physician took a blood sample of the defendant at the hospital, which sample, upon analysis, indicated intoxication. Over objection, the blood sample evidence was admitted at the trial. The U.S. Supreme Court upheld extraction of the blood under the circumstances stated, holding that the constitutional guaranties against self-incrimination and unlawful search and seizure barred only compulsory "communications" or "testimony", either verbal or in writing; i.e. "that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question * * * did not involve compulsion to these ends" (Emphasis supplied). At the time the blood was taken Schmerber was under valid arrest for "driving an automobile while under the influence of intoxicating liquor" as to which there was "plainly probable cause".
Thus, while the high Court held it was permissible to take blood involuntarily from the body of a person upon the supposed constitutional distinction between the forcible extraction of blood and the forcible extraction of spoken or written words, yet the all-important fact remains, crucial to our holding here, that when the blood was so taken Schmerber was actually under arrest and in actual legal custody of the police upon a valid criminal charge.
And while the writer personally disagrees thoroughly with the high Court's distinction between "testimonial evidence" and "physical evidence" in applying the constitutional guaranties against compulsorily extracted evidence, as heretofore expressed in Giddens v. Cannon, Fla.App. 1967, 193 So.2d 453,[1] yet we of this 2nd District Court are all agreed that blood forcibly taken by the police from a "free" man, who is not under arrest nor in police custody upon any criminal charge, cannot be later used to convict him of a criminal offense under the constitutional guaranties. The ominously frightening consequences of a contrary doctrine are obvious. Even the Schmerber opinion (which incidentally was a five-four decision, with three separate dissenting opinions) significantly emphasized throughout the majority opinion that Schmerber at the time was under legal arrest and in police custody, under whose direction *732 the blood was taken. In fact, in all the cases upholding the taking of human blood for use in a criminal trial against the donor, we find that in each of such cases the person whose blood was taken was either under valid arrest on a criminal charge or else gave free and definite consent to such taking, or actually in most cases both.
In Touchton v. State, 1944, 154 Fla. 547, 18 So.2d 752, the Florida Supreme Court in a similar case said:
"Shortly after the collision the appellant was arrested and carried to a hospital for treatment for injuries sustained by him in the collision. While in the hospital a sample of his blood was taken and a chemical test of it was made. The result of the blood test was submitted to the jury to prove intoxication. Appellant claims that this was a violation of Sec. 12, Declaration of Rights, Florida Constitution, providing `no person shall be * * * compelled in any criminal case to be a witness against himself * * *'.
Constitutional inhibitions of this character grew out of the common law right of the accused against self-incrimination. The rule is set forth in 22 C.J.S. Criminal Law § 651, that:
`Evidence resulting from a medical examination of accused for the purposes of the prosecution rather than for treatment, after an accusation has been made against him, is admissible where, in the absence of any compulsion, accused submits or consents to the examination.'" (Emphasis supplied)
Timmons v. State, Fla.App. 1968, 214 So.2d 11, a 1st District Court case, was a manslaughter case growing out of the operation of a motor vehicle while intoxicated, and wherein a blood sample taken from the defendant was involved. The evidence, together with result of the laboratory analysis, was admitted; but in that case, while at the local Medical Center, soon after the accident, defendant voluntarily stated he was "willing to have a blood alcohol test" and in fact "had already signed a consent to the test". At the trial Timmons did not even object to the blood sample evidence on constitutional grounds but relied solely on the alleged statutory immunity under F.S. § 317.171 F.S.A. later herein discussed.
Giddens & Cannon, supra, was a blood sample (civil) case from this 2nd District Court. The author of the instant opinion also authored Giddens v. Cannon, but we take absolutely no pride in that opinion. In Giddens the rejection by the trial Court of the blood sample specimen of the plaintiff driver was reversed largely upon the authority of Schmerber, supra, and also another high Court case of Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448.
But we misconceived completely, in Giddens, the true rationale of Schmerber, which we believe we have now correctly set forth herein. And Breithaupt should not have been mentioned at all in Giddens because, while it involved a manslaughter conviction following a motor vehicle collision resulting in the death of three persons wherein blood (shown by laboratory analysis to indicate intoxication) was involuntarily taken from the unconscious defendant shortly after the accident, the objection to such evidence made thereafter at the state Court manslaughter trial on constitutional grounds was held by the high Court to be unavailable to the defendant under Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782. However, the pertinent part of Wolf, which had influenced Breithaupt, had been subsequently overruled in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, and in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, as was so pointed out in the later Schmerber opinion, thus neutralizing any vitality of Breithaupt.
The saving grace of our opinion in Giddens v. Cannon, was that it ultimately *733 reached the proper conclusion, namely, the reversal of the trial Court in improperly rejecting the proffered evidence of the blood sample specimen and laboratory test thereof showing intoxication  not however because of anything said by the high Court in either Schmerber or Breithaupt, but simply because the plaintiff driver in Giddens had readily agreed to such blood-taking, having in fact voluntarily signed a "consent form" for the drawing of his blood for a blood alcohol test, thus effectually waiving any objections to such procedure based on the constitutional guaranties. Anything stated in the Giddens v. Cannon opinion, respecting the applicability of Schmerber or Breithaupt, inconsistent with the instant opinion, was inappropriate to determination of that case and is herewith specifically overruled.
In State v. Esperti, Fla.App. 1969, 220 So.2d 416, this Court had a case similar in principle to the instant case. There, shortly after a homicide had been committed, the defendant had been forcibily subjected by officers at the local police station, after his lawful arrest, to a chemical test for purpose of ascertaining "the presence vel non of nitrate, or powder burns, which could indicate whether the defendant had recently fired a gun". He was later indicted for first degree murder but pending trial he moved to suppress the evidence as to the forcible chemical test and the results thereof and also certain other testimony "concerning his acts and conduct surrounding resistance to the administration thereof". The Court denied the motion to suppress "the results of the test" but granted other aspects of the motion, without giving reasons for either ruling. The defendant had contended that the "results of the test" were inadmissible under the constitutional guaranties as raised in the instant case. The State appealed from "the latter portion of the Court's ruling" and the defendant cross-appealed "as to the first portion". But the cross-appeal was subsequently withdrawn and in such posture of the appeal this Court, in an opinion by Judge McNulty, held that "we need not go into the correctness of the trial Court's ruling in this regard [as to the forcible chemical test]. Nor do we have to decide, at this time, whether the results of the chemical test involved here are admissible in Florida." So the point was not decided.
The Florida Courts have consistently maintained a liberal view in applying the constitutional guaranties against compulsory self-incrimination and unreasonable searches and seizures in fields other than blood-taking.
As said by the Supreme Court in State ex rel. Byer v. Willard, Fla. 1951, 54 So.2d 179: "It has long been settled that the provision in our Declaration of Rights that `no person shall be * * * compelled in any criminal case to be a witness against himself' must be broadly and liberally construed in order to secure the protection designed to be accomplished by it; and that to this end no technical limitations should be placed upon the terms employed * * * in furtherance of the right sought to be secured". And the 3rd District Court in Gardner v. State, Fla.App. 1965, 170 So.2d 461: "The courts of this State have jealously defended the privilege of one's constitutional right not to be forced to testify against himself". And this 2nd District Court in Collins v. State, Fla.App. 1962, 143 So.2d 700: "The right of citizens to be secure from illegal search and seizure and to be free from the necessity of giving evidence against themselves as guaranteed by the Fourth and Fifth Amendments of the Federal Constitution and by Section 12 and Section 22 of the Declaration of Rights of the Florida Constitution, F.S.A. is inalienable and must be protected at the risk that an individual criminal may go without punishment." To the same effect see this Court's opinion in Carter v. State, Fla.App. 1967, 199 So. 324.
We hold in the case sub judice that the blood-taking evidence was inadmissible when tested by the constitutional guaranties *734 against compulsory self-incrimination and unreasonable searches and seizures, in light of the facts and circumstances under which the blood was forcibly taken.

(2) The privilege under F.S. § 317.171 F.S.A.

F.S. § 317.131(1) F.S.A. requires the driver of a motor vehicle involved in an accident which results in bodily injury to or the death of any person or damage to property of $50.00 or more to forward a written report of such accident to the Department of Public Safety within five days. Failure so to do subjects him under F.S. § 317.701 F.S.A. to a criminal penalty. F.S. § 317.131(3) F.S.A. requires the officer who investigates such accident to forward a written report of the accident to the Department within 24 hours after completing his investigation. F.S. § 317.171 F.S.A. provides immunity to such vehicle driver in making said reports in the following language:
"All accident reports made by persons involved in accidents shall be without prejudice to the individual so reporting and shall be for the confidential use of the department or other state agencies having use of the records for accident prevention purposes, * * * No such report shall be used as evidence in any trial, civil or criminal, arising out of an accident, * * *". (Emphasis supplied).
The Supreme Court, in Stevens v. Duke, Fla. 1949, 42 So.2d 361, and Herbert v. Garner, Fla. 1955, 78 So.2d 727, held that statements or evidence transmitted by the driver of such a vehicle to the investigating officer or officers after the accident, forming the basis for the officer's report to the Department, sufficiently discharges the statutory duty of the driver under § 317.131(1) as to the written report required. See also Kaplan v. Roth, Fla. 1956, 84 So.2d 559 and Ippolito v. Brener, Fla. 1956, 89 So.2d 650.
Stevens held that the immunity provided by § 317.171 applies to participants or witnesses to a motor vehicle accident who give information to a "law enforcement officer who in the regular course of his duty investigates such a motor vehicle accident, whether at the time of and at the scene of the accident or thereafter". (Emphasis supplied). And Nash Miami Motors, Inc. v. Ellsworth, Fla.App. 1961, 129 So.2d 704, writ disch. Fla. 1962, 142 So.2d 733, held that the immunity also applies to evidence so given, not only to the officer first investigating the accident for purpose of making the report aforesaid, but also to evidence so supplied by such person to a subsequent officer or officers.
And the statutory immunity of § 317.171 has been specifically extended to blood samples taken from a participant in a motor vehicle accident and the results of a chemical test of such blood for alcoholic content, such as occurred in this case. See State v. Coffey, Fla. 1968, 212 So.2d 632, and the 1st District Court case of Cooper v. State, Fla.App. 1966, 183 So.2d 269, which latter case was specifically approved by the Supreme Court in Coffey. In Cooper the Court said:
"We believe the decision of the Florida Supreme Court in the foregoing case [Stevens v. Duke] fixes the law of the case sub judice. There can be no question but that the taking of the blood sample was intended as a part of the investigation for the purpose of completing the report, required of the officer. Further, it was at the insistence and request of the officer that the doctor took the blood sample. This blood sample formed a basis, or at least a portion of the basis for the officer's written report. If the report was inadmissible because of F.S. Section 317.171, F.S.A., then the information obtained by whatever method, if obtained for the purpose of making the report speak the facts, was inadmissible. Therefore it was error for the trial court to admit such evidence to be presented to the jury." (Emphasis in *735 text except the words "by whatever method", which are herewith supplied).
We quote from Nash Miami Motors, which was also approved in Coffey:
"But appellee [plaintiff Ellsworth] urges that the second report given to officer Fontana was not an `accident report' within the meaning of the statute. He argues that the statement given to officer Fontana was not for the purpose of making an accident report but was for discovery of possible criminal charges which might arise from the accident. From the viewpoint of the person interrogated there is little difference. The distinction, to have meaning, would require realization by a person charged with giving such a report that one officer was reporting the accident, while a second, who asked the same questions, was not reporting the accident. It further appears that for the statement of a defendant to be privileged under this statute it is not necessary for it to be given to an investigating officer, or given at the scene of the accident, or that the statement be used in a subsequently filed report of the accident. Ippolito v. Brener, supra."
It is true, as stated in Coffey, supra, that 
"[t]he investigating officer, after completing his accident report * * * may then `change his hat', so to speak, discontinue his role as an agent of the Department of Public Safety, and assume that of an officer charged with the duty of investigating a crime which he has probable cause to believe has been committed. And where, as in the instant case, every precaution is taken to make sure that the accused's constitutional rights are protected, the evidence resulting from such investigation is as admissible in this type of case as in any other."
And further 
"[t]here was no doubt that the respondent [defendant Coffey] knew that the accident-report phase of the investigation had ended and that the blood test was being given to him in connection with the charge of manslaughter with which he was faced. The respondent testified that he voluntarily consented to take the test  apparently because he hoped it would not indicate an undue amount of intoxication".
No such situation existed in the instant case. The blood sample was taken involuntarily from Mitchell at the hospital immediately after the accident. The written report required to be made of the accident to the Department of Public Safety by § 317.131, supra, could not have been made and completed for several days after the blood-taking and after his release from the hospital, for that is when Mitchell took and surrendered his driver's license to officer Powell at the local police station. He was not arrested for manslaughter or any other criminal offense while at the hospital, nor told that he would be so arrested thereafter, or even that he would be so investigated. He was not arrested for any offense until some time after his discharge from the hospital. Even the jurors took note of this circumstance while they were deliberating and unsuccessfully sought explanation from the Court about it.
Summing up, we hold that the blood-taking evidence was erroneously admitted because it infringed upon constitutional rights and also because it was privileged, that it was materially harmful to the defendant, and constituted reversible error.
Reversed and remanded for further proceedings in the Court below not inconsistent herewith.
MANN and McNULTY, JJ., concur.
NOTES
[1] "How the Courts can square the involuntary taking of human blood and using it to convict the unwilling donor of a crime with the Federal and State constitutional guaranties against self-incrimination, is beyond my humble comprehension". Giddens v. Cannon, 193 So.2d at page 457. Or as more aptly spoken by Justice Black in his dissenting opinion in Schmerber: "To reach the conclusion that compelling a person to give his blood to help the State convict him is not equivalent to compelling him to be a witness against himself strikes me as quite an extraordinary feat." 384 U.S. at page 773, 86 S.Ct. at 1837.