Kenneth Owen PETERSON, Respondent,

v.

STATE of South Dakota, Appellant.

No. 12092.

Supreme Court of South Dakota.

Argued Sept. 15, 1977.

Decided Dec. 30, 1977.

Dale L. Morman, Sturgis, for respondent.

Judith A. Atkinson, Asst. Atty. Gen., Pierre, for appellant; William J. Janklow, Atty. Gen., Pierre, on the brief.

PORTER, Justice.

This case involves the South Dakota Implied Consent Law.[1] The issue presented is

---

1. Statutory provisions shown are those in effect on the date of Peterson's arrest. They do not reflect changes in SDCL 32–23–1, 32–23–7, and 32–23–11, under chapters 158, 199 and 258, 1976 S.D.Sess.Laws. The 1976 amendments are not relevant to the issues in this case.

SDCL 32–23–10: Any person who operates any vehicle in this state shall be deemed to have given his consent to a chemical analysis of his blood, urine, breath or other bodily substance for the purpose of determining the amount of alcohol in his blood, as provided in § 32–23–7, provided that such test is administered at the direction of a law enforcement officer having lawfully arrested such person for a violation of § 32–23–1.

Such person shall be requested by said officer to submit to such analysis and shall be advised by said officer of his right to refuse to submit to such analysis and the provisions of §§ 32–23–11 and 32–23–12 in the event of such

whether the driver's *later* offer to take the chemical test nullified his *earlier* refusal to take the test when requested to do so by the arresting officer. If his conduct did not constitute a refusal of the test, his license to drive may not be revoked.

## RELEVANT FACTS

Respondent Peterson was arrested for DWI, in violation of SDCL 32–23–1, in Sturgis, on February 2, 1976, at 7:35 p.m. The arresting officer asked him to submit to a chemical analysis of his breath, and advised him of his rights in connection with the requested test. In response, Peterson told the officer that he "didn't know what to answer." He also told the officer that he (Peterson) had to "talk to somebody" before submitting to the test. The arresting officer then took Peterson to the Meade County Courthouse in Sturgis and there, at about 7:50 p.m., again requested that he submit to the breath test and again explained his rights under the Implied Consent Law. Peterson gave essentially the same response as before. Thereupon the officer asked Peterson to submit to a chemical analysis of his *blood*, and again explained the implied consent rights to him. Peterson again gave the same response. The arresting officer then went to the Sturgis Police Station, leaving Peterson at the county jail in custody of the jailer. Peterson told the jailer that he wanted to make a telephone call and was permitted to call a friend, who came to the jail. After talking with Peterson at the jail, the friend telephoned an attorney, and then told Peterson to take the test. At Peterson's request, the friend telephoned the arresting officer at the Sturgis Police Station to say that Peterson would

refusal with respect to the revocation of such person's driving license.

SDCL 32–23–11: If any person described in § 32–23–10, after request and explanation as therein provided, shall refuse to submit to such chemical analysis, then such test shall not be given. In such event, the department of public safety shall revoke for one year his license to drive and any nonresident operating privilege he may have in his possession after opportunity for hearing pursuant to chapter 1–26 if hearing is demanded, it shall find that the law enforcement officer complied therewith and the refusal was made by that person.

SDCL 32–23–12: Any person whose license has been canceled, suspended, or revoked by the department of public safety under the provisions of § 32–23–11 shall have the right to file a petition within thirty days thereafter for a hearing in the matter in the circuit court for the county wherein such person was charged with the violation, and such court is hereby vested with jurisdiction and it shall be its duty to set the matter for trial de novo upon ten days' written notice to the department, and thereupon to take testimony and examine into the facts of the case and to determine whether the petitioner's license is subject to cancellation, suspension, or revocation under the provisions of § 32–23–11.

SDCL 32–23–1: A person shall not drive or be in actual physical control of any vehicle while:

(1) There is 0.10 per cent or more by weight of alcohol in his blood;

(2) Under the influence of an alcoholic beverage;

(3) Under the influence of any controlled drug or substance to a degree which renders him incapable of safely driving; or

(4) Under the combined influence of an alcoholic beverage and any controlled drug or substance to a degree which renders him incapable of safely driving.

SDCL 32–23–7: In any criminal prosecution for a violation of § 32–23–1 relating to driving a vehicle while under the influence of intoxicating liquor, . . . the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:

(1) If there was at that time five hundredths per cent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

(2) If there was at that time in excess of five hundredths per cent but less than ten hundredths per cent by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant;

(3) If there was at that time ten hundredths per cent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor.

Per cent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood.

take the test. The arresting officer replied that it was too late. No test was given.

Peterson testified that he had consumed six glasses of beer in the approximately two hours before his arrest. The circuit court found as a fact that "it would take twenty minutes to prepare for the [breathalyzer] test which would leave one hour from the first time the request was made for the test until the petitioner [Peterson] himself requested to take the test."

The circuit court reviewed the written transcript of testimony given before the administrative hearing officer and then entered findings and conclusions that Peterson's conduct did not constitute a test refusal and that his license was, therefore, not subject to revocation.

The facts in this case are essentially undisputed, save only Peterson's claim that it was an hour, and the State's claim that it was an hour and twenty-three minutes, between the initial test request by the arresting officer and the time the officer was advised Peterson would take the test. Our decision would be the same regardless of which version is accepted.

Peterson does not question that (1) there was probable cause for his arrest for DWI under SDCL 32–23–1; (2) that after his lawful arrest the arresting officer requested that he submit to a chemical analysis of the type authorized under SDCL 32–23–10; and (3) that the officer properly advised him of his rights in connection with the requested test and of the consequences of his failure to take the test.

Under this record we regard the issue before us as solely one of law. Upon the State's appeal from the judgment of the circuit court we hold that Peterson's admitted conduct constituted, in law, a refusal of the test, and we reverse the judgment for the reasons which follow.

### THE IMPLIED CONSENT LAW

#### I

Our implied consent statute was enacted in 1959. 1959 S.D. Sess. Laws, Chapter 264. In 1966 we said:

Implied consent statutes, such as we have, are designed to combat the increasing menace and danger caused by drunken drivers using the public highways and their elimination or control presents a most perplexing problem to law enforcement officers and to the courts. The legislative purpose behind such statutes is clear. The right to drive being a privilege granted by the state it has, for the protection of the public, imposed conditions on that privilege; one being that a person consent to a chemical analysis under the conditions specified in the statutes. Once the conditions of the statute are met, refusal to submit to the test results in mandatory loss of license. [citations omitted] *Beare v. Smith,* 82 S.D. 20, 25, 140 N.W.2d 603, 606 (1966).

In applying our Implied Consent Law to the issue here, we should adopt that construction most likely to achieve the objective sought, which is "a fair, efficient and accurate system of detection and prevention of drunken driving. . . . The immediate purpose of . . . the implied consent [law] is to obtain the best evidence of blood alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated." *Zidell v. Bright,* 264 Cal.App.2d 867, 869, 71 Cal.Rptr. 111, 112–13 (1968).

The "best evidence of blood alcohol content" is furnished by a chemical test of the type provided for in our law. However, it is a "well-established rule that the probative value of a chemical test for intoxication diminishes with the passage of time." *Ent v. State, Department of Motor Vehicles,* 265 Cal.App.2d 936, 940, 71 Cal. Rptr. 726, 729 (1968). "We are told the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Blow v. Comm. of Motor Vehicles,* 83 S.D. 628, 634, 164 N.W.2d 351, 354 (1969), quoting from *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). "Such being true, the longer the test [is] delayed the more favorable the situation would become for the subject."

*Toms v. State,* 95 Okl.Cr. 60, 68, 239 P.2d 812, 820 (1952). Therefore, "[c]learly implied in the statute is the requirement that one of its described tests be submitted to and completed expeditiously; otherwise the purpose of the law would be frustrated." *Smith v. Cozens,* 25 Cal.App.3d 300, 302, 101 Cal.Rptr. 787, 788 (1972). "There is no sound reason to give the driver the opportunity to delay the test to his benefit contrary to the purpose of the test and the statute to obtain as accurate an indication of his condition as possible. *See* Donigan, Chemical Tests and the Law 45 (2d ed. 1966); Erwin, Defense of Drunk Driving Cases § 15.03 (3rd ed. 1972); . . ." *Harlan v. State,* N.H., 308 A.2d 856, 858 (1973).

## II

In the case before us Peterson argues that he did not delay the test for an unreasonable length of time. To support his contention he cites *Lund v. Hjelle,* 224 N.W.2d 552 (N.D.1974). In the *Lund* case counsel for commissioner Hjelle had conceded that "a chemical test two hours after the arrest could have been extrapolated and would be accurate." Id. at 557.[2]

▮▮▮ We note the process of extrapolation involves expert testimony in which the witness uses the known rate of average elimination of blood alcohol in the average person, plus the test result in the particular case, and reaches "a fairly reasonable estimate" of the percentage of blood alcohol in the average person at the time of the event, if the average person had the blood alcohol concentration shown by the particular test involved. If, because of a delay caused by the driver, the chemical test ultimately taken does not show at least a 0.10% blood alcohol, the State suffers prejudice because

resort to extrapolation introduces the problem of proving that the defendant on trial is an "average person." One purpose behind the presumption statute, SDCL 32–23–7(3),[3] is to reduce the number of DWI cases in which DWI must be proven by resort to extrapolation testimony.[4] We decline to follow the reasoning of the majority in *Hjelle,* supra. Essentially the same contention Peterson advances here, for which he cites *Hjelle,* has been rejected in California, *Zidell v. Bright,* 264 Cal.App.2d 867, 869, 71 Cal.Rptr. 111, 112 (1968), and in New Hampshire, *Harlan v. State,* N.H. 308 A.2d 856, 858 (1973).

## III

▮▮▮ The chemical testing system provided under implied consent laws is reasonable for both the driver and the State. A chemical test, properly conducted, is the best available method of determining the blood alcohol content of the driver, which, in turn, is accepted as the most reliable method of determining whether the driver is or is not under the influence of intoxicating liquor.

▮▮▮ "[T]he need of a scientific means of determining with certainty the degree of intoxication resulting from the amount of alcohol in the blood, in order to eliminate guesswork and speculation, particularly in so-called 'borderline cases' " was recognized before 1951. *People v. Bobczyk,* 343 Ill. App. 504, 509, 99 N.E.2d 567, 570 (1951). In 1957, a California court stated: "The value of such objective scientific data of intoxication to supplement the fallible observations by humans of behavior seemingly symptomatic of intoxication cannot be disputed." *People v. Sudduth,* 65 Cal.2d 543, 546, 55

**2.** The court quotes from the Donigan text as follows:

"Thus, from the known length of elapsed time between the taking of the specimen for analysis and the event in issue, the known rate of average elimination of blood alcohol in the average person, and the result of the chemical test in the particular case, experts in this field can arrive by the process of extrapolation at a fairly reasonable estimate

of the percentage of blood alcohol in the average person at the time of a certain event if he had the quantity of alcohol in his blood as shown by the chemical test in the case on trial." R. Donigan, Chemical Tests and the Law, p. 46 (2d ed. 1966).

**3.** *See* note 1, supra.

**4.** *See State v. Spry,* 87 S.D. 318, 329, 207 N.W.2d 504, 510 (1973).

Cal.Rptr. 393, 395, 421 P.2d 401, 403 (1967). This was particularly true since "[m]edical science recognizes sixty pathological conditions which produce symptoms similar to those produced by alcohol, . . ." *People v. Bobczyk,* 343 Ill.App. 504, 510, 99 N.E.2d 567, 570 (1951). " 'Chemical tests eliminate mistakes from objective observation alone, and they disclose the truth when a driver claims that he has drunk only a little and could not be intoxicated. They protect the person who has not been drinking to excess but has an accident and has the odor of alcohol on his breath. They save a person from [a] drunken driving charge when his conduct creates the appearance of intoxication but who actually is suffering from other causes over which he had no control.' [citations omitted]" *Robertson v. State ex rel. Lester,* 501 P.2d 1099, 1102 (Okl.1972). As this court said in *Blow v. Comm. of Motor Vehicles,* 83 S.D. 628, 634, 164 N.W.2d 351, 354 (1969): "The scientific accuracy revealed by a test may exonerate a suspect just as readily and conclusively as it may incriminate him. *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448."

### IV

■■■ Under our Implied Consent Law, in effect since 1959, the driver consents, in advance, to submit to a chemical test if he drives upon the public highway, is arrested for DWI by an officer having reasonable grounds to do so, and is requested by the officer to take a chemical test. As stated, this provision for a test protects both the State and the innocent driver. But under our law, the driver is also given the right to refuse to take the test requested by the officer. When the arrested driver refuses after he has been properly advised of his rights, under our law the test "shall not be given." SDCL 32–23–11.[5] (But for the right to refuse given the driver by our statute, the police, having upon probable cause arrested the driver for DWI, could constitutionally obtain a blood sample from him, *without his consent. Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

■■■ We see no language in our law authorizing the arrested driver to delay his decision to take the requested test. We have already held that the arrested driver has no legal or constitutional right to consult counsel before deciding, and that a request to delay the test for that purpose is, in law, a refusal of the test by the driver. *Blow,* supra. In *Beare,* supra, we held that our law will not permit a qualified or conditional refusal, which is to say it will not permit a qualified or conditional *assent* to take the test requested by the arresting officer. From the requirement of SDCL 32–23–10 that the test be administered "at the direction of a law enforcement officer having lawfully arrested [the driver] for [DWI]," we see a legislative intent that the decision of the arresting officer to request a test, and the arrested driver's response thereto, should not be delayed. *Zidell v. Bright,* 264 Cal.App.2d 867, 71 Cal.Rptr. 111 (1968).

> The decision to submit to a chemical test is not one which requires debate, consultation, or negotiation, but calls for a simple yes or no to the request for submission. Because of the rapidity with which the passage of time and the physiological processes tend to eliminate alcohol ingested by the body, and because of the remedial intent of the statute anything less than an unqualified consent by the licensee to the requested test constitutes a refusal to do so. *Robertson v. State ex rel. Lester,* 501 P.2d 1099, 1104 (Okl. 1972).[6]

We conclude in the case at bar that Peterson refused, in law, to take the chemical test requested by the arresting officer, and that Peterson may not defeat revocation of

---

5. *See note 1, supra.*

6. *See also Swenumson v. Iowa Department of Public Safety,* Iowa, 210 N.W.2d 660, 662 (1973); and *State v. Pandoli,* 109 N.J.Super. 1, 3, 262 A.2d 41, 42 (1970).

his driver's license by showing he thereafter changed his mind.[7]

## PETERSON'S OTHER CONTENTIONS

■ On appeal Peterson also contends that he did not receive a fair hearing before an impartial hearing examiner and was thus denied due process of law. A similar contention was raised in, and overruled by, this court in *Matter of Campbell*, S.D., 250 N.W.2d 280 (1977). Here Peterson appealed to the circuit court, which entered judgment reversing the decision of the hearing examiner. "He [had] no cause for a complaint of lack of due process." *Matter of Campbell*, S.D., 250 N.W.2d 280, 282 (1977).

■ Peterson also contends that the State on appeal may not challenge the sufficiency of the evidence to support the circuit court judgment. The State timely submitted proper proposed findings of fact to the trial court, but certain of the conclusions of law submitted at the same time expressly directed entry of judgment reversing the hearing examiner. The purpose of submitting proposed conclusions of law to the trial court, under SDCL 15–6–52(a), is to inform the trial court of the correct conclusions of law it should enter, in the view of the party submitting the proposed conclusions.

■ Although Peterson requested and was entitled to a trial de novo in the circuit court, *State, Dept. of Public Safety v. Cronin*, S.D., 250 N.W.2d 690 (1977), the parties stipulated that the circuit court could render its decision without taking evidence, by considering only the transcript of the testimony given at the hearing before the hearing examiner. This was not a trial de novo, *Howe v. Comm. of Motor Vehicles*, 82 S.D. 496, 149 N.W.2d 324 (1967), but Peterson has no standing to complain, since he agreed to the procedure. The trial court here was in no better position to find facts

from a written record of testimony than is this court on appeal. *Clark & Son v. Nold et al.*, 85 S.D. 468, 185 N.W.2d 677 (1971), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

The legal issue before the trial court was simply whether Peterson's admitted conduct constituted a refusal of the requested test under our Implied Consent Law. Reading the proposed conclusions of law of the State in conjunction with the entire record then before the trial court, we conclude the legal issue was sufficiently presented to the trial court and is properly before the court on appeal.

## CONCLUSION

For the reasons given we conclude that Peterson refused the requested chemical test and that his driver's license was, therefore, properly revoked. Accordingly, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court so that judgment may be entered affirming the order of revocation of March 25, 1976, in the revocation proceeding before the South Dakota Department of Public Safety.

DUNN, C. J., and WOLLMAN and MORGAN, JJ., concur.

ZASTROW, J., concurs specially.

ZASTROW, Justice (concurring specially).

I agree that the actions and words of Peterson constituted a refusal under our implied consent law. However, I would adopt the conditions stated in *Lund v. Hjelle*, 1974, N.D., 224 N.W.2d 552, as circumstances under which an earlier refusal might be rescinded and the driver allowed to take a chemical test. Those conditions are:

---

7. *See People v. Shorkey*, 23 Ill.App.3d 662, 321 N.E.2d 46 (1974); *Krueger v. Fulton*, Iowa, 169 N.W.2d 875 (1969); *State v. Palmer*, 291 Minn. 302, 191 N.W.2d 188 (1971); *Heffernan v. Kissack*, 192 Neb. 637, 223 N.W.2d 486 (1974); *In re Brooks*, 27 Ohio St.2d 66, 271 N.E.2d 810

(1971); and *Cavagnaro v. Motor Vehicles Div., Dept. of Transp.*, 19 Or.App. 725, 528 P.2d 1090 (1974). Any statements in *Hanlon v. Comm. of Motor Vehicles*, 80 S.D. 316, 123 N.W.2d 136 (1963), which appear to conflict with this opinion are disapproved.

"[W]here \* \* \* one who is arrested for driving while under the influence of intoxicating liquor first refuses to submit to a chemical test to determine the alcoholic content of his blood and later changes his mind and requests a chemical blood test, the subsequent consent to take the test cures the prior first refusal when the request to take the test is made within a reasonable time after the prior first refusal; when such a test administered upon the subsequent consent would still be accurate; when testing equipment or facilities are still readily available; when honoring a request for a test, following a prior first refusal, will result in no substantial inconvenience or expense to the police; and when the individual requesting the test has been in police custody and under observation for the whole time since his arrest." 224 N.W.2d at 557.

However, for the reasons hereinafter stated, I would concur in the reversal of the circuit court decision.

At the scene of the arrest, Peterson was requested to submit to a breathalyzer test. He was then taken to the Meade County jail and again requested to submit to the breathalyzer test, then to a blood test. Peterson's actions and words again constituted a refusal. Acting upon that refusal, Peterson was booked and allowed to call a friend. The friend suggested that he take the test, but Peterson was not certain and did not advise the arresting officer that he would consent. He was then placed in a cell. At the time, the arresting officer left the jail and returned to his duties.

In the meantime, Peterson's friend called an attorney, called Peterson at the jail, then came to the jail and conversed with Peterson in the cell. At the urging of the friend, Peterson finally agreed to consent and requested that the jailer call the arresting officer. The officer was located at the police station and advised that Peterson would now take the test. This the officer refused

to do. This rescission of the earlier refusals came one hour after the last request had been made by the officer at the jail and one hour and twenty-three minutes after the arrest.

The rescission made here does not satisfy the *Lund* conditions for three reasons: (1) a rescission made one hour after the driver has been presented the opportunity to take the test and refused has not been made within a reasonable time,\* (2) a rescission made after the officer has returned to his other duties for the length of time involved here is a substantial inconvenience, and (3) a rescission was not made when Peterson had been under continuous observation since the arrest.

---

\* In this manner, I disagree with the result of *Lund*, if not the rationale. I think that in *Lund* the refusal to submit to the blood test at the hospital when the test was available was

final. A rescission one hour after the driver was given the opportunity to take the test is unreasonable.