ROSS, Judge
(dissenting).
I respectfully dissent from the majority’s conclusion that the test-refusal statute violates substantive due process for two reasons, one fundamental and one specific. First, I disagree fundamentally with the assumed premise that has been accepted in some recent test-refusal cases, including Bernard, that the United States Supreme Court decision in Missouri v. McNeely provides suspected drunk drivers a legitimate substantive due process challenge to the state’s chemical test-refusal criminal statute. Second, recognizing that we are nonetheless bound to accept that premise in light of Bernard’s reasoning, I also disagree with the majority’s conclusion that the test-refusal statute is not narrowly tailored to achieve the state’s compelling interest.

Criminalizing a suspected impaired driver’s chemical test refusal does not trigger strict scrutiny.

Recognizing that we are bound to follow Bernard’s rationale, I merely note that I fundamentally disagree that the United States Supreme Court decision in Missouri v. McNeely elevates to the level of strict scrutiny a substantive due process challenge to the state’s chemical test-refusal criminal statute.
I am convinced that McNeely neither expressly nor implicitly stands for anything beyond its two-tier holding. Its first-tier holding informs us that police cannot, without a warrant or an exception to the warrant requirement, forcibly draw blood from a suspected drunk driver under the . Fourth Amendment. Missouri v. McNeely, — U.S. -, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013). And its second-tier holding establishes that the biological circumstance of alcohol naturally dissipating from an impaired driver’s body is not itself an exigent circumstance that allows police to draw the driver’s blood without a warrant. Id. at 1563. Reading more into McNeely — particularly, the notion that a state violates the Due Process Clause if it punishes suspected impaired drivers for refusing to submit to a chemical test under the state’s impaired-driving law — exaggerates McNeely’s reach.
McNeely involved an actual nonconsen-sual search. As such, it answers' whether the search in that case — a nonconsensual blood draw — -was permissible under the Fourth Amendment. It answers nothing more. And its reasoning does not undermine the Supreme Court’s consistent rec *406 ognition that states can punish suspected drunk drivers for refusing to be tested for drug and alcohol use. Even while the McNeely Court was declaring that states cannot conduct a forced search after a chemical-test refusal, it paradoxically reaffirmed the idea that states can nevertheless punish a suspected drunk driver who refuses to comply with a lawful request for a chemical test. Supporting its holding that the Fourth Amendment prohibits Missouri from warrantlessly drawing blood from a suspected drunk driver without his consent and without exigent circumstances, the McNeely Court highlighted several alternatives to warrantless, non-consensual blood draws, and it expressly described these alternatives as “legal” (that is, constitutional). Id. at 1566. The Court reminded us that, among other constitutional penalties that states can employ to secure chemical-test evidence in drunk-driving cases, a state does not violate a defendant’s Fifth Amendment rights by urging a jury to infer from a defendant’s refusal to submit to chemical testing that he is guilty of the crime of drunk driving. Id. The McNeely Court approvingly cited South Dakota v. Neville, 459 U.S. 553, 563-64, 103 S.Ct. 916, 922-23, 74 L.Ed.2d 748 (1983). Although Neville is not a Fourth Amendment case, McNeely certainly is. And it is in applying the Fourth Amendment that McNeely expressly reminds us through Neville that a state can constitutionally rely on the driver’s test refusal (that is, the driver’s exercise of his Fourth Amendment right not to be blood-tested without consent and without a warrant) as circumstantial evidence on which a jury could convict the driver of a crime. In other words McNeely establishes that a criminal conviction arising in part from a driver’s chemical-test refusal is not unconstitutional simply because the Fourth Amendment would have prohibited the state from forcing that same driver to submit to the chemical test.
The Supreme Court’s recognition that states can constitutionally rely on a driver’s test refusal to convict that driver of the crime of drunk driving implies strongly that, even though a nonconsensual chemical test is a “search” under the Fourth Amendment, due process is not offended when the state criminally punishes test refusal as a crime in itself. This recognizes that the right to refuse testing for drunk driving is different in nature from other rights. Notice for example that, by contrast, due process would never allow a jury to infer a defendant’s guilt for refusing to consent to a search in the traditional, non-drunk-driving setting. See, e.g., United States v. Runyan, 290 F.3d 223, 249 (5th Cir.2002) (“[T]he circuit courts that have directly addressed this question have unanimously held that a defendant’s refusal to consent to a warrantless search may not be presented as evidence of guilt.”); United States v. Thame, 846 F.2d 200, 206-07 (3rd Cir.1988) (holding the same but adding by contrast that a defendant’s decision to exercise his Sixth Amendment right to counsel cannot serve as evidence of guilt); State v. Larson, 788 N.W.2d 25, 32-33 (Minn.2010) (holding that a court erroneously admits as evidence of guilt a defendant’s refusal to undergo voluntary DNA testing); State v. Jones, 753 N.W.2d 677, 687 (Minn.2008) (noting that it would be improper for prosecutor to comment on defendant’s refusal to give saliva sample). That the Supreme Court in McNeely buttressed its Fourth Amendment holding on the states’ “legal” authority to rely on test refusals to convict drivers of a crime significantly undermines the notion that the Minnesota criminal test-refusal statute is subject to invalidation by the Fourth Amendment’s intersection with the Due Process Clause. It is an anomaly in law that the right to refuse *407 chemical testing does not include the right not to be penalized for the refusal, but it is a reasonable anomaly given the unique nature of the underlying crime.
For the reasons I stated previously in our unpublished opinion in State v. Chasingbear, given the Supreme Court’s deferential approach to the states’ authority to penalize suspected impaired drivers for test refusals, I do not agree that Minnesota’s test-refusal statute invites a strict-scrutiny analysis. No. A14-0S01, 2014 WL 3802616 (Minn.App. Aug. 4, 2014), review denied (Minn. Apr. 14, 2015). It is true that we strictly scrutinize a challenged law that implicates a fundamental right. Essling v. Markman, 335 N.W.2d 237, 239 (Minn.1983). And we will uphold such a law under strict scrutiny only if it serves a compelling state interest and is narrowly tailored to serve that interest. See id. But when a challenged statute does not implicate a fundamental right, it violates substantive due process rights only if, under a rational-basis test, the challenger establishes that the statute is not reasonably related to a legitimate governmental interest. See Reno v. Flores, 507 U.S. 292, 305, 113 S.Ct. 1439, 1448-49, 123 L.Ed.2d 1 (1993); In re Individual 35W Bridge Litigation, 806 N.W.2d 820, 830 (Minn.2011).
Applying the reasoning of the state supreme court decision in Bernard, the majority concludes that a fundamental, Fourth Amendment right is at stake here. As I have stated, I believe that no Fourth Amendment right is implicated here because, unlike in McNeely, no search occurred. I think we should instead decide more specifically whether a suspected impaired-driver’s refusal to submit to chemical testing is itself a fundamental right. The caselaw informs us how to approach that question. The United States Supreme Court has explained, “[W]e have regularly observed that the Due Process Clause specially protects those fundamental rights .and liberties which are, objectively, deeply rooted in this Nation’s history and tradition ... and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.” Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997) (quotations omitted). If one accepts the reasoning of Bernard, the question would be very broadly stated — Does a person have a fundamental right to refuse to consent to a warrantless search? And if this is the question, I would agree the answer is, yes, a fundamental right is at stake even if the Fourth Amendment is not directly implicated. If, however, the question is more narrowly stated — Does a suspected im- < paired driver have a fundamental right to refuse a chemical test that will reveal the precise quantity of alcohol and drugs in his body? — I am convinced that one must say no, a fundamental right is not at stake.
The narrow approach to defining the right is the correct approach. The Supreme Court has “required in substantive-due-process cases a ‘careful description’ of the asserted fundamental liberty interest.” Id. at 721, 117 S.Ct. at 2268; see also McDonald v. City of Chicago, 561 U.S. 742, 797, 130 S.Ct. 3020, 3053-54, 177 L.Ed.2d 894 (2010) (Scalia, J., concurring) (explaining that under the due process framework the Supreme Court has “sought a careful, specific description of the right at issue in order to determine whether that right, thus narrowly defined, was fundamental”). In Glucksberg, the Supreme Court rejected the court of appeals’ framing of the issue broadly as “ “whether there is a liberty interest in determining the time and manner of one’s death’ ” or “ ‘is there a right to die?’ ” and instead framed it narrowly as “whether the ‘liberty’ specially protected by the Due Process Clause includes a right to commit *408 suicidé which itself includes a right'to assistance in doing so.” Glucksberg, 521 U.S. at 722-23, 117 S.Ct. at 2268-69.
I believe we should follow the Supreme Court’s lead, narrowly rather than broadly construing the right to be tested here. And narrowly construed, the right at stake is the right of suspected impaired drivers to refuse to submit to chemical testing for alcohol content. No one can say that this is a right deeply rooted in national history and tradition. Far from it: to the extent history and tradition illuminate the subject, they embrace state impaired-driving laws that prohibit impaired-driving suspects from refusing police requests for chemical testing, and they do so in the implied-consent setting without any regard to whether exigent circumstances exist, to support a warrantless blood draw, penalizing those who refuse to be tested. See McNeely, 133 S.Ct. at 1566. McNeely itself looks favorably on this method of chemical-test enforcement, explaining that “all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State,, to consent to [chemical] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense.” Id.
The short history and tradition of automobile regulation indicate that laws regulating automobile use have existed since the advent of the automobile. Automobile history is short; just over one hundred years ago, auto travel was so rare that operators of horse-drawn vehicles had the statutory authority to demand — by a mere wave of the hand — that any passing motor vehicle must yield until the horse-drawn vehicle passed, and an automobile driver’s failure to stop when so signaled was illegal. See Mahoney v. Maxfield, 102 Minn. 377, 378-81, 113 NW. 904, 905-06 (1907) (applying a 1903 Minnesota statute and surveying similar laws in other-states). Even by the 1920s, cars remained so rare that police officers did not use them on patrol, relying instead on horses, bicycles, and the newly introduced motorized cycles. See Edberg v. Johnson, 149 Minn. 395, 398, 184 N.W. 12, 13 (1921) (“As an aid to officers on patrol duty no vehicle more serviceable than the motorcycle has as yet been invented. Of course it is possible for such officers to use automobiles instead of motorcycles, but their use would be equally if not more dangerous to others if driven at a high rate of speed.”).
But while relatively few cars were on the road at the advent of automobile transportation, the statutory prohibition against operating a motor vehicle while intoxicated developed in unison with the state’s restrictions on issuing driver’s licenses. See, e.g., Mannheimer Bros. v. Kan. Cas. & Sur. Co., 147 Minn. 350, 353,180 N.W. 229, 230 (1920) (discussing Minnesota statute that “directs that no license shall be issued to excessive users of intoxicating liquors, and in another section expressly declares that it shall be a misdemeanor for anyone to drive while intoxicated”). In 1939 no “habitual drunkard” could be licensed to drive in Minnesota. See Minn. Laws. ch. 401, § 4(4), at 783 (codified at Mason’s Minn.Stat. § 2720-144a(4) (Supp. 1940)). Within just 40 years of the onset of automobile-operator licensing, the United Statés Supreme Court recognized that chemical testing of suspected drunk drivers provides “a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication.” Breithaupt v. Abram, 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957). And it observed that “[m]od-ern community living requires modem scientific methods of [drunk-driving] detection lest the public go unprotected.” Id. at 439, 77 S.Ct. at 412. As recently as the *409 1980s, the Supreme Court saw no fundamental right for a suspected drunk driver to refuse to be tested in the implied-eon-sent setting, declaring bluntly, “Respondent’s right to refuse the blood-alcohol test, by contrast [to a right rooted in the Constitution], is simply a matter of grace bestowed by the [state] legislature.” Neville, 459 U.S. at 565, 103 S.Ct. at 923.
Given the relevant history, it is clear to me that a suspected impaired driver’s right to refuse drug and alcohol testing is not among those “fundamental rights and liberties which are, objectively, deeply rooted in this Nation’s history and tradition.” In my view, nothing in this claimed right is “implicit in the concept of ordered liberty such that neither liberty nor justice would exist if [it] were sacrificed.” This would lead us to test the statute under a rational-basis analysis, not a strict-scrutiny analysis, and the statute would easily pass muster.

Even under strict scrutiny, the statute criminalizing a suspected impaired driver’s refusal to undergo a chemical test is not unconstitutional.

Of course, this court is bound to faithfully follow supreme court precedent, including Bernard. Although I therefore reluctantly join the majority in accepting that Bernard implies that the United States Supreme Court decision in Missouri v. McNeely requires us to apply strict scrutiny in a substantive due process challenge to the state’s chemical test-refusal criminal statute when blood has been requested, I believe the statute nonetheless survives strict scrutiny. I therefore dissent on this specific ground.
The majority recognizes that the state has a compelling interest at stake here, but I believe that it too broadly identifies that interest and, therefore, mistakenly holds that the test-refusal statute fails to be sufficiently narrowly tailored. The majority correctly identifies only part of the state’s compelling interest, which is its “compelling interest in highway safety that justifies efforts to keep impaired drivers off the road.” But examining the statutory scheme more closely, I believe that the state’s interest goes deeper because it contains a related complementary component. The statutory scheme evidences the state’s interest not only in obtaining scientific evidence of the suspected impaired drivers’ chemical impairment to facilitate accurate convictions to keep- them .off the road; it also evidences the state’s strong interrelated interest in protecting suspected impaired drivers from being customarily subjected to forced blood draws by police, who have the constitutional authority to easily obtain a warrant and draw blood from every suspect.
Chemical tests are essential to securing impaired-driving convictions, which in turn allow the. state to incarcerate offenders and keep them off the road. And as a practical matter, the only way the state can subject an unwilling suspected impaired driver to a chemical test is to draw the driver’s blood; police have no apparatus to forcibly extract a person’s breath or urine. The legislature is aware that, unless constrained by statute', police could draw blood after every traffic stop during which the officer develops probable cause (a very low standard)' to believe that the driver may be impaired by drugs or alcohol. All the officer must do is smell an alcoholic beverage on the driver’s- breath or notice a slur in the driver’s speech and redness in his eyes, and the officer could quickly obtain the obligatory warrant. See U.S. Const, amend. IV (requiring probable cause for search warrants); Minn.Stat. § 626.11(a) (2012) (“If the judge is satisfied ... that there is probable cause ... the judge must issue a signed search warrant. ...”); Minn.Stat. § 169A.20, subd. 1 *410 (2012) (“It is - a crime for any person to drive ... any motor vehicle ... when ... the person is under the influence of alcohol.”). The statute informs us that the legislature at once wants both a means to remove drunk drivers from the roadways and to avoid a police-state atmosphere where police, supported by an easily obtained warrant, routinely cart unwilling drivers to nearby hospitals or jails and direct the extraction of a blood sample for testing.
The state achieves its first objective of removing drunk drivers from the roadways by that part of the impaired-driving law that criminalizes both impaired driving and a suspected impaired driver’s refusing to submit to chemical testing. Minn.Stat. § 169A.20, subds. 1, 2 (2012). The state achieves its related second objective of preventing police from routinely invading the bodily integrity of drivers by prohibiting police from drawing blood from unwilling suspects. The test-refusal law declares bluntly, “If a person refuses to permit a test, then a test must not be given.” Minn.Stat. § 169A.52, subd. 1 (2012).
I would have no difficulty concluding that the state’s interest in protecting its citizens from constitutionally permitted but legislatively intolerable police intrusion is a compelling interest. The nation’s founders pledged their lives and fortunes and fought a revolution primarily to resist oppressive governmental power. See The Declaration of Independence para. 2 (U.S. 1776) (objecting to “a long train of abuses and usurpations” in order “to provide new Guards for their future security”). Both the federal and state constitutional framers fortified “the right of the people to be secure in their persons ... against unreasonable searches.” U.S. Const, amend. IV; Minn. Const, art. I, § 10. And the people have perpetually negotiated the border between the public commitment to liberty and the law enforcement tendency to expand its policing power. The federal constitution establishes only the outer edge of that border and allows states to more tightly restrain police activity through constitutional and statutory law. See California v. Greenwood, 486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988) (“Individual states may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution.”); Atwater v. City of Lago Vista, 532 U.S. 318, 352, 121 S.Ct. 1536, 1556, 149 L.Ed.2d 549 (2001) (noting approvingly that many states “have chosen to impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenses”).
This state has exercised that right to restrain its police more tightly than the federal Constitution. The supreme court has, on several occasions, interpreted the state constitutional language that echoes the Fourth Amendment more restrictively than the way the United States Supreme Court interprets the Fourth Amendment. See, e.g., Ascher v. Comm’r of Pub. Safety, 519 N.W.2d 183, 187 (Minn.1994) (holding that the Minnesota constitution prevents the operation of suspicionless road blocks despite the U.S. Supreme Court’s holding in Michigan Department of State Police v. Sitz); State v. Askerooth, 681 N.W.2d 353, 362-63 (Minn.2004) (declining to follow the U.S. Supreme Court’s decision in Atwater v. City of Lago Vista, and holding that the Minnesota Constitution requires a reasonableness limitation on the scope and duration of a Terry detention); In re E.D.J., 502 N.W.2d 779, 783 (Minn.1993) (declining to follow the U.S. Supreme Court’s decision in California v. Hodari D. and holding that under the Minnesota Constitution a totality of the circumstances test applies to determining whether a seizure has oc *411 curred). And the people of the state, through their elected representatives, have here enacted a statute that restrains police activity even more restrictively than the principles of their constitutions. Particularly, in the same chapter the legislature requires each suspected drunk driver to submit to a chemical test when an officer requests one, Minn.Stat. § 169A.51, subd. 1(a) (2012), it correspondingly establishes that “[i]f a person refuses to permit a test, then a test must not be given.” Minn.Stat. § 169A.52, subd. 1. The two linked provisions, only working together, serve the compelling complementary state interests of keeping drunk drivers off the road and keeping police from carting off every driver who smells like beér for forced, truly nonconsensual blood extraction. The majority’s framing of the state’s interest does not take into account the interrelated second component of the law.
I also would have no difficulty concluding that the state’s complementary law is narrowly tailored to further the state’s interest in protecting citizens from constitutionally permitted but intolerable police intrusion while most effectively removing impaired drivers from the roadways. I see no other means for the state to accomplish this dual objective. The majority suggests three alternatives, but they are clearly inadequate.
■ Of course the state could, as the majority first suggests, “offer a breath test [instead of a blood test] to a suspected drunk driver and then, if the [breath] test is refused, the state may charge the person with the crime of test refusal.” But a breath test reveals only the presence of alcohol, not any of the myriad controlled substances that also cause the impairment that the impaired-driving statute criminalizes. See Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 625, 109 S.Ct. 1402, 1418, 103 L.Ed.2d 639 (1989) (observing that “breath tests reveal the level of alcohol in the employee’s blood stream and nothing more”). The majority’s first alternative to the current statute therefore does not meet even the majority’s partially framed compelling state objective of keeping impaired drivers off the road.
The majority suggests second that the state could instead prosecute the arrested driver without the benefit of any chemical test at all. This also is no solution because it both weakens prosecutions and jeopardizes the innocent. Chemical test results arm the jury with forensic evidence without which more innocent drivers would likely be convicted and more guilty drivers would certainly be acquitted. Over half a century ago the Supreme Court recqgnized this, observing that, as to the guilty, a blood test “is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication,” and as to the innocent, “the [blood] test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses.” See Breithaupt, 352 U.S. at 439, 77 S.Ct. at 412. The majority’s second suggestion would at once make Minnesota’s roadways less safe and the evidence admitted in its impaired-driving trials less accurate.
The majority’s third suggested substitute for the criminal test-refusal statute is simply that “police can secure a search warrant to test the person’s blood.” The majority is correct that police can indeed secure a search warrant to test every non-consenting, suspected impaired driver’s blood. The majority fails to notice, however, that this is exactly the harm the statute attempts to avoid. Police could obtain a warrant in every stop in which the statute authorizes an officer to request a blood test because the same low standard — prob *412 able cause — allows police to either requést a test under the statute or to obtain a warrant to draw blood. See U.S. Const, amend. IV (requiring probable cause for search warrants); Minn.Stat. § 169A.51, subd. 1(b) (2012) (requiring probable cause of impaired driving for officer to request a chemical test). So ,although the majority’s urging police to use the full measure of their constitutional authority to obtain an . easily secured, chemical-test warrant continues to facilitate impaired driving prosecutions, it undermines rather than furthers the other component of the compelling interest that the statute protects. The difference between the current .scheme that the legislature has adopted and the scheme that the majority now suggests to replace it is that, under the legislative scheme, the suspected impaired driyer always has the choice to refuse a blood test, but under the majority’s scheme, the driver never has the choice to refuse a blood test. We can predict that prosecutors and police will soon follow the majority’s suggestion in every case, because it will be the only remaining reliable means to always secure the evidence necessary to incarcerate impaired drivers and protect Minnesota’s roadways.
To understand why the majority’s three alternatives to the test-refusal statute fail to satisfy both aspects of the state’s compelling interest is to understand why the statute is precisely tailored to achieve the-dual interests it addresses. I cannot conceive of any arrangement more tightly fitted to the statute’s objective to remove impaired drivers from the road by potential incarceration and at the same time to protect suspected impaired drivers from being routinely subjected to forced, non-consensual blood draws by police. Under the statute, the public is best protected from the dangers of impaired' drivers because in every case the state will obtain either the necessary evidence to pursue an impaired-driving conviction or the necessary evidence' to pursue a similarly weighted test-refusal conviction. And this protection occurs while every driver retains the absolute liberty to reject a blood test altogether, because, if he does, “no test shall be given.” Everyone wins.
But after today’s decision, police should never merely request a blood test, because if they do, upon refusal, not only is no test permitted, but also conviction is far less likely. Every police' officer doing her duty to gather evidence to ensure the criminal conviction of apparently drug-impaired drivers has but one remaining course: give the driver no choice; call a judge every time; get a warrant every time; and administer a blood draw (the most invasive and costly of the three types of chemical tests) if necessary by force, every time. The state will continue to obtain its evidence to convict and remove impaired drivers from the road, but it will cost the people their significant statutory restraint on police power.
The majority therefore gives the defense bar a hollow victory: today one suspected impaired driver escapes his conviction for exercising his supposedly constitutional right to refuse to consent to a blood test, and tomorrow every suspected impaired driver has effectively lost the right to refuse to consent to a blood test.